1   Mark G. Tratos (Bar No. 1086)
    tratosm@gtlaw.com
2   Nancy Ayala (Bar No. 7146)
    ayalan@gtlaw.com
3   Peter Ajemian (Bar No. 9491)
    ajemianp@gtlaw.com
4   GREENBERG TRAURIG, LLP
    3773 Howard Hughes Parkway
5   Suite 400 North
    Las Vegas, Nevada 89169
6   Telephone: (702) 792-3773
    Facsimile: (702) 792-9002
7
    *Counsel for Plaintiff*
8

9                   **UNITED STATES DISTRICT COURT**

10                       **DISTRICT OF NEVADA**

11  Teller, an individual,

12              Plaintiff,                    Case No. 2:12-cv-00591-JCM-GWF

13  v.

14  Gerard Dogge (p/k/a Gerard Bakardy), an   **PLAINTIFF TELLER'S MOTION FOR
    individual.                               DEFAULT JUDGMGENT AND
15                                            PERMANENT INJUNCTION AGAINST
                                             DEFENDANT DOGGE**
16              Defendant.

17

18          Plaintiff Teller ("plaintiff" or "Teller") hereby moves this court for entry of default judgment

19  and a permanent injunction against defendant Gerard Dogge, p/k/a Gerard Bakardy ("defendant" or

20  "Dogge").

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

*GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002*

1    This motion is made pursuant to Rule 55 of the Federal Rules of Civil Procedure and is based

2  upon the attached memorandum of points and authorities, the supporting exhibits attached hereto,

3  the affidavit of Mark G. Tratos ("Tratos Affd."), the papers, pleadings, declarations and exhibits on

4  file herein, and any oral argument that this court may allow.

5    DATED this 19th day of August, 2014.

6    GREENBERG TRAURIG, LLP

7

8    /s/ Mark G. Tratos
    Mark G. Tratos (Bar No. 1086)

9    Thomas F. Kummer (Bar No. 1200)
    Nancy R. Ayala (Bar No. 7146)

10    Peter Ajemian (Bar No. 09491)

11    3773 Howard Hughes Pkwy, Suite 400 North
    Las Vegas, NV 89169

12    Counsel for Plaintiff

**I.    INTRODUCTION**

14    After more than two years of costly and contentious litigation, marked by Dogge's refusal to

15  produce discovery, numerous frivolous filings and utter disregard of this court's orders, the Court

16  granted Teller's motion to strike Dogge's answer and enter default as a sanction.   This court entered

17  these sanctions under Federal Rules 16 and 37 for Dogge's repeated violations of this court's orders

18  and his recent refusal to attend trial in person.  By this motion, Teller now seeks the last procedural

19  step in completing the case, the entry of default judgment against Dogge, including injunctive relief,

20  statutory damages, and attorneys' fees and costs.

**II.    BACKGROUND**

22    **A.    Teller is an Internationally Famous Entertainer and Magician**

23    Teller and his partner, Penn Jillette, are famous in the magic community for creating

24  innovative magic tricks, and have become well-known throughout the world for their unique brand

25  of entertainment.   Penn & Teller have enjoyed major national and worldwide success, including

26  sold-out runs on and off Broadway, world tours, Emmy-winning TV specials, and hundreds of guest

27  appearances on popular television shows.  *See* Declaration of Teller ("Teller Decl."), ¶¶ 1-3, attached

28  hereto as **Exhibit 1.**  By way of example, Penn & Teller recently completed a three-week tour of the

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 891169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   United Kingdom, where they performed for Prince Charles at Windsor Castle.  *Id*.  Teller has also

2   enjoyed recent critical acclaim co-directing a magic-themed production of Shakespeare's "The

3   Tempest," and the documentary film Tim's Vermeer, which was shortlisted for the Oscars and

4   nominated in Britain for the BAFTA Awards.

5   Currently, Penn & Teller are performing their live show at The Rio All-Suite Hotel & Casino

6   in Las Vegas, where it has been running for over thirteen years, making it the longest running,

7   successful and most-beloved shows in Las Vegas history.  *See* Teller Decl., ¶ 4.

8   **B.   Teller has been Entertaining Audiences for Nearly Forty Years.**

9   Penn & Teller are famous for their unique brand of magic and comedy, and particularly for

10   the unusual and creative spin they put on magic.  Teller has created many of the original routines and

11   magic tricks that have been featured in Penn & Teller's show over the years.  One of the most

12   successful and lasting original magic tricks in their performances is a dramatic pantomime work

13   called "Shadows," which is the subject of the instant litigation.  Teller created and first performed

14   the highly innovative dramatic work "Shadows" in 1975, worked years to perfect the illusion, and

15   obtained a U.S. Copyright Registration for it in 1983. *See* **Exhibit 1,** Teller Decl., ¶¶ 5-6; "Shadows"

16   has been performed by Teller in Penn & Teller's show tens of thousands of times, including live and

17   televised performances throughout the United States and the world.  In fact, "Shadows" has appeared

18   in every Penn & Teller show performed on and off Broadway and in their national tours for more

19   than three decades.  *See* **Exhibit 1**, Teller Decl., ¶ 8.

20   "Shadows" consists of a spotlight trained on a small vase containing a single flower, a rose,

21   which is set on a table.  *See* **Exhibit 1,** Teller Decl., ¶ 9.  The light falls in such a manner that the

22   shadow of the rose is projected onto a white screen positioned some distance behind it.  The

23   magician enters the otherwise peaceful scene with a knife, and proceeds to use it to dramatically

24   sever first the leaves and then the petals of the rose's shadow on the screen.    Slowly,

25   correspondingly, one-by-one, the leaves of the real rose casting the shadow fall to the ground,

26   breaking from the stem at exactly the point where the magician severed the shadow projected on the

27   screen.  The effect seen by the audience is to witness the murderous destruction of the beautiful

28   flower via the knife acting upon its shadow.  *Id*., ¶ 7.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   Jim Steinmeyer, world-renowned prop designer, magic historian and writer, has opined that

2   "Shadows," among all of Penn & Teller's repertoire, has an iconic quality as the piece with the

3   longest association to Teller himself.  It is considered one of the rare new plots in the canon of 20th

4   Century magic and is Teller's principal claim to fame in magic history.  *See* Expert Witness Report

5   of Jim Steinmeyer dated April 11, 2013, at 8-10, attached hereto as **Exhibit 2.**

6   **C. <u>Dogge Misappropriated Teller's Persona and Illusion to Sell Mail-Order Props</u>**

7   Defendant Gerard Dogge has never been a professional magician.  *See* deposition of Gerard

8   Dogge, taken on June 11, 2013 ("Dogge depo."), at 31:24-33:7, attached hereto as **Exhibit 3.**  Over

9   the years, he has made a living performing musical acts in small restaurants and cafes.  *Id*. at 17:13-

10  17; 18:7-11.  He picked up magic as a hobby a decade or so ago.  For the last couple of years Dogge

11  has been unemployed, without any real source of income and is living on his savings.  *Id*. at 216:2-

12  23.  He claims he has neither "big contracts" nor "big properties," only "big debts."  *See* March 28-

13  29, 2012 emails between Teller and Dogge, at TELLER000013-15, attached hereto as **Exhibit 4.**

14  During his deposition, Dogge explained that he began having trouble booking his musical act years

15  ago.  *See* **Exhibit 3**, Dogge Depo. at 24:25-26:22.

16  Dogge first became acquainted with "Shadows," in approximately 2007-2008.  *Id*. at 46:4-

17  47:7.  Dogge admits to watching a video of Teller performing "Shadows" multiple times before

18  Dogge decided to put together his own prop involving a rose that can fall apart in order that he could

19  perform Teller's illusion.  *Id*. at 55:16-19.  Sometime in 2012, after Dogge had finished making his

20  prop, he filmed a sales video of himself using the rose prop to perform Teller's "Shadows" and gave

21  his performance a similar name - "The Rose and Her Shadow."  *See id*. at 64:4-9; 67:4-11.  At the

22  end of Dogge's video, the words "A double illusion for the price of one" appear on the screen.[1]  *See*

23  YouTube screenshot of Dogge, pka Gerard Bakardy, attached hereto as **Exhibit 5,** at

24  TELLER000071. Dogge then posted his video to YouTube and tagged it with the keywords "Penn"

25  and "Teller."  *See id*. at TELLER000069; Dogge's answer to plaintiff's second set of requests for

26  admissions, dated March 28, 2013, at response to request no. 31, at 6, attached hereto as **Exhibit 6.**

27

---

28  [1]  This appears to reference the floating table which Dogge proposes to sell which bears a striking similarity to the table created and sold by the magician Losander.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1  Dogge informed viewers that his prop was for sale by pasting a textual narrative below the

2  video stating, "It could be a wonderful and refreshing addition to all your coin or card tricks."  *See*

3  **Exhibit 5** at TELLER000069.  Dogge also created a print advertisement for his mail-order prop,

4  explaining that the prop came with an instructional DVD and manual and that the price for all three

5  items was 2,229€, the equivalent to about $3,000.00.  *See* **Exhibit 3**, at 105:19-106:5; Dogge Dutch

6  advertisement and English translation, attached hereto as **Exhibit 7.**  Dogge claims that he priced his

7  prop at this amount because it was the price he had seen other, unrelated magic props sold for on the

8  internet.  **Exhibit 3**, at 106:3-21.  Jim Steinmeyer states that the prop was marketed to magicians

9  who would both immediately recognize the trick as being Teller's and would use it to perform the

10  famous illusion rather than try to come up with a new illusion on their own, thus forcing Teller to

11  bring numerous enforcement actions.  *See* Declaration of Jim Steinmeyer ("Steinmeyer Decl."), ¶6,

12  attached hereto as **Exhibit 8**.

13  Also around that time, Dogge set out to obtain a copyright in various alternative

14  presentations that could be done with the rose prop.  In so doing, he visited the website of the United

15  States Copyright Office and researched how to obtain a copyright.  *See* **Exhibit 3**, Dogge Depo. at

16  125:2-8.  He filed his own copyright registration first in March 2012.  Despite his familiarity with

17  the website, he allegedly did not make the effort to determine if Teller had a copyright in the

18  illusion's performance Dogge used in his video.  *Id.*

19  **D.  <u>Defendant's Unauthorized Use of Teller's Signature Work Damages Teller's Mark</u>**

20  **<u>and Confuses the Public</u>**

21  Like a few famous magicians of the past, after he retires, Teller could license the

22  performance of "Shadows" to only a highly gifted and truly extraordinary magician who would use

23  it in a market that in no way overlaps Teller's.  *See* **Exhibit 1,** Teller Decl., ¶ 15.  Although Teller

24  has created and performed numerous illusions over the years, "Shadows" is Teller's signature magic

25  trick.  He would not allow just anyone to perform it and possibly ruin its significance.

26  As Mr. Steinmeyer explains, a magician's trademark illusion can be a significant source of

27  income and avenue to continue his legendary status.  Mr. Steinmeyer refers in his report to the

28  legendary Harry Blackstone, Sr. as a prime example: "Harry Blackstone Sr. was very well known for

a handful of small effects:  The Disappearing Birdcage, Dancing Handkerchief, and a pickpocket routine with the audience. These were included in every performance and, indeed, his versions of these tricks were avoided by his fellow professionals.  After his retirement, the Birdcage and Handkerchief routines were sold, exclusively, by Blackstone, through magic dealers.  This was a mark of recognition of the importance of these effects, and their association with Blackstone.  His son, Harry Blackstone Jr., later included these routines in his own shows.  *See* **Exhibit 2**, Steinmeyer.  Rpt., at 9, n.4.  Perhaps most importantly, Blackstone's most famous trick, the Floating Light Bulb, was licensed by Gay Blackstone, Blackstone's widow, to two young magicians who paid a license fee to perform the illusion.

In addition, the ability and right to control one's trademark is critical.  Mr. Steinmeyer states that if a version of 'Shadows' fell into the hands of a less professional or more careless performer, its performance would be detrimental to Teller's success.  It would cease being special and unique in his show, and would lose its value.  Steinmeyer Rpt, **Exhibit 2**, at 11.  Moreover, if a version of 'Shadows' was marketed to the broader magic community, it would impact Teller's opportunity to profit from the sale of this routine, in the future, to other professionals.  *Id.*

Dogge has himself admitted that Teller's brand will be damaged because of Dogge's unauthorized use of "Shadows" to sell his own goods and services.  Dogge hoped that the potential of continued damage to Teller would result in a big payday for Dogge.  When Teller tried to reach a compromise with Dogge prior to filing suit, Dogge responded, "I am really surprised by the low value you assign to the trick that you claim is your signature trick."  *See* **Exhibit 4** at TELLER000013.  He continued, "How much is it worth to you, having the knowledge that . . . By selling the newer version, the old version loses its value dramatically. . . . Even protracted lawsuits cannot prevent that 'damage' is done."  *Id.* at TELLER000014; *see also* **Exhibit 3**, Dogge Depo., at 157:5-13.  When the negotiations turned to extortion, Teller filed suit.

### E.   Brief Procedural Background and Claims Remaining in the Action

This litigation has been unnecessarily long and protracted, and exceptionally costly.  Teller filed suit in April of 2012.  Over the last two-plus years Dogge has done everything possible to delay the litigation and drive up the costs for Teller.  At least fifteen motions were filed in the discovery

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

period alone.  For example:

- Dogge evaded service, forcing Teller to file a motion to serve by publication and actually serve by publication, which cost tens of thousands of dollars in attorney time and actual costs;

- Dogge refused to produce key evidence in the litigation such as the YouTube posted videos, the illusion's instruction manual, and the instructional DVD which was offered for sale with his prop, necessitating several motions to compel and a motion to mirror image Dogge's hard drive (which he claimed he had inadvertently erased the evidence from) and/or obtain Dogge's consent to get the videos from YouTube;

- Dogge refused to show up to the court-ordered computer mirror imaging, although Teller incurred the expense of finding a Belgian IT company that could perform mirror imaging and making relevant arrangements with them;

- Shortly before his scheduled oral deposition, Dogge informed Teller he would only give a written answers to a deposition written in Dutch, causing Teller to have to file a motion to compel oral deposition and delaying Dogge's deposition by several weeks;

- After a year of litigation in English, Dogge decided to communicate only in Dutch, to include demanding Dutch translations of discovery before responding to discovery requests, then again he communicated only in Dutch when Teller attempted to engage Dogge in formulating the joint pretrial order, which required Teller to incur additional expenses of translation;

- Dogge refused to participate in crafting a mutually agreeable protective order governing discovery, then refused again to sign one once it was ordered by the court, necessitating further meet and confer and motion practice;

- Dogge repeatedly filed public material that the court had ordered sealed, necessitating a number of additional motions to seal;

- Dogge repeatedly filed frivolous motions such as the "Motion to Investigate the Plaintiff's Hard Drive," in which he alleged that Teller is somehow involved in

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

criminal conduct and should be investigated by the FBI and Interpol, and he filed a completely unsubstantiated motion for case-dispositive sanctions against Teller, necessitating substantial responses in opposition and, in the case of the Motion to Investigate, a motion to strike the document, which was granted;

- Dogge made outrageous personal allegations against Teller in requests for procedural relief, so that Teller was forced to respond via opposition instead of filing a non-opposition or filing nothing at all, as in Dogge's Motion to Protect and Guarantee the Integrity of the Proceeding [doc. no. 165] and Response to Teller's Motion for Expedited Hearing (doing the same in response to a procedural motion);

- Dogge refused to participate in the crafting of the joint pretrial order pursuant to Local Rule 16-3, necessitating numerous communications to Dogge;

- Dogge refused to submit a good faith statement of the terms under which Dogge would be willing to settle the litigation, rendering Teller's good faith efforts to craft a reasonable settlement statement that could serve as a useful starting point for negotiations pointless;

- Dogge stated for the first time after refusing to assist in the pretrial order, that he would not be coming to trial in the United States in person, but offered to appear telephonically, a request that this court rightfully denied, necessitating two additional motions for sanctions and countless pointless hours of trial preparation, to include attendance at two calendar calls, preparation of motions in limine, the trial brief, the exhibit list, trial exhibits, and findings of fact and conclusions of law, as well as witness preparation for a trial which was never to occur.

During the litigation, as a result of Dogge's conduct, Magistrate Judge Foley sanctioned Dogge with an adverse inference. Judge Foley found that "[t]he jury in this litigation shall be instructed to presume that the subject DVD and manual, if available, would tend to support plaintiff's claim that defendant violated Plaintiff's copyright…" *See* doc. no. 178. After the ruling on the motion for summary judgment, Judge Foley extended this adverse inference to Teller's claim of unfair competition as well. *See* doc. no. 223.

1    Ultimately, as a result of Dogge's repeated statements that he would not be attending trial in

2    person, and his refusal to comply with the pretrial requirements set out by the court, this court

3    granted Teller's renewed emergency motion for case-terminating sanctions on July 9, 2014, entering

4    default and striking Dogge's answer in its entirety.  *See* doc. no. 225.   This motion for default

5    judgment is the next logical (and hopefully last) step in finally drawing this litigation to a close.  As

6    this court has already granted summary judgment as to copyright liability, Teller seeks entry of a

7    default judgment as to the willfulness of the copyright infringement, as well as unfair competition.

8    Teller also seeks permanent injunctive relief and attorneys' fees and costs.

9    **III.   LEGAL ARGUMENT**

10       **A. STANDARD OF REVIEW**

11    Fed. R. Civ. P. 55(b)(2) governs applications to the court for entry of default judgment.  Rule

12    55 provides that judgment by default may be entered by the court after a party against whom a

13    judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is

14    shown by affidavit.  In instances where a court has entered a Rule 37 sanction of default and struck

15    the answer of the defendant, default judgment is properly applied for via Rule 55.   *See*

16    *Communications Center, Inc. v. Hewitt*, 2005 WL 3277983, *3 (E.D. Cal. 2005).

17    "The general rule is that upon default the factual allegations of the complaint, except those

18    relating to the amount of damages, will be taken as true".  *L G Elecs., Inc. v. Adv. Creative Comp.*

19    *Corp.*, 212 F.Supp.2d 1171, 1175 (N.D. Cal. 2002).  The facts alleged in Teller's complaint are now

20    deemed true, and the entry of clerk's default together with the documents filed herewith establish

21    that (1) Teller has satisfied the requirements for Rule 55, and (2) that Dogge has failed to respond to

22    the complaint and meets no exception for default, as this court has ordered Dogge's answer stricken

23    as a sanction.  Accordingly, Teller requests that default judgment be entered against Dogge.

24       **B. ENTRY OF DEFAULT JUDGMENT IS WARRANTED IN THIS CASE**

25    Granting or denying default judgment is within the court's sound discretion.   *Draper v.*

26    *Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986).  "In applying this discretionary standard, default

27    judgments are more often granted than denied."  *See PepsiCo v. Tiunfo-Mex, Inc.*, 189 F.R.D. 431,

28    432 (C.D. Cal. 1999).  The Ninth Circuit has set forth the following seven factors for district courts

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

to consider when determining whether to grant default judgment.

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Each of the *Eitel* factors, to the extent applicable since default was entered as a sanction, is satisfied here.

### 1. Possibility of Prejudice to the Plaintiff

Courts find that the possibility of prejudice to the plaintiff is great where the defendants will not appear and litigate, as the plaintiff will likely be without other recourse for recovery. *See Holiday Systems International of Nevada v. Illusion Boutique Hotel*, 2012 WL 5334647 (D. Nev. 2012); *BMW of North America, LLC v. Quality Star Benzz LLC*, 2013 WL 1338233 (D. Nev. 2013). That is the case here. Dogge has ceased participation in the lawsuit, and this court has ordered default as a sanction. Without default judgment, Teller will have no recourse for recovery. This factor favors entry of default judgment.

### 2. The Merits of Plaintiff's Substantive Claims and the Sufficiency of the Complaint

Plaintiff's claims are meritorious. As noted above, the Court takes the well-pleaded factual allegations in the complaint as true. *See Lagos v. Monster Painting, Inc.*, 2013 WL 5937661, \*2. Accordingly, if the complaint states a claim, default judgment is warranted. Further, this court has already granted summary judgment as to copyright liability, and stated that a reasonable jury could find in favor of Teller on his unfair competition claim. *See* Order dated March 20, 2014 (*See* doc. no. 184). Additionally, this court has since granted Teller an adverse inference that if the DVD and manual had been produced, they would have supported liability for unfair competition. *See* doc. no. 223. This satisfies the second and third *Eitel* factors. *See Microsoft Corp. v. Ricketts*, 2007 U.S. Dist. LEXIS 40898, at \*4 (After entry of default, well-pleaded factual allegations in the complaint

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   are taken as true and the merits of plaintiff's substantive claims and the sufficiency of the complaint

2   are considered together).   The merits of Teller's claims are discussed below.[2]

3   ### a. Dogge Has Already Been Found Liable for Copyright

4   ### Infringement

5       This court has already entered summary judgment against Dogge as to copyright

6   infringement liability.  *See* Order dated March 20, 2014 (doc. no. 184).

7   ### b. Dogge is Liable for Willful Copyright Infringement

8       This court has already determined that Dogge infringed Teller's copyright, and ordered that

9   Dogge pay Teller's attorneys' fees pursuant to 17 U.S.C. § 505.   *See* doc. no. 184, Order on

10  Summary Judgment.   Accordingly, the only portion of the copyright claim remaining before the

11  court is the "willfulness" of Dogge's infringement. Whether Dogge willfully infringed determines

12  the range of damages.[3]

13      Generally, defendants are found to have acted willfully when they have knowledge their

14  conduct constitutes copyright infringement.  *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d

15  1332, 1335 n.3 (9th Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S. Ct. 1019 (1991).   However,

16  knowledge may be actual or constructive, and willfulness is also shown where the defendant acted in

17  reckless disregard of the possibility of infringement.   *See UMG Recordings, Inc. v. Disco Azteca

18  Distributors, Inc.*, 446 F.Supp.2d 1164, 1173 (E.D. Cal. 2006); *see also In re Aimster Copyright

19  Litigation,* 334 F.3d 643, 650 (7th Cir.2003) ("Willful blindness is knowledge, in copyright law…as

20  it is in the law generally."). "To refute evidence of willful infringement, [a defendant] must not only

21  establish its good faith belief in the innocence of its conduct, it must also show that it was reasonable

22  in holding such a belief." *Id*., *quoting Peer Int'l*, 909 F.2d at 1336; *see also Knitwaves, Inc. v.

23  Lollytogs Ltd. (Inc.)*, 71 F.3d 996 (2d Cir. 1995) (affirming finding of willfulness where the

24  defendant admitted to wanting the same "look and feel" as the plaintiff's product, but admitting it

25  did not look for copyright notices).   The fact that Dogge admitted his understanding that Shadows is

26

27  [2] For the sake of brevity, this motion incorporates by reference Teller's motion for summary judgment on the unfair
        competition claim, which goes into greater detail as to that claim.

28  [3] The damages determination is addressed in Section B. of this brief, *infra*.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Teller's signature work, that his illusion would damage Teller's forever and that he sought his own copyright registrations for his speak directly to Dogge's intent to infringe. Moreover, the refusal to produce the instruction manual and demonstration DVD of the infringing illusion is telling. The Magistrate Judge has ordered that an adverse inference can be drawn by the trier of fact that those documents would have supported Teller's claim of intentional copyright infringement.

Dogge had both actual and constructive knowledge of the infringement. Dogge posted two YouTube videos advertising his prop with an infringing performance of Teller's Shadows. It is undisputed that Dogge had seen Teller's performance prior to making the videos, and copied the performance with no investigation into whether Shadows was a copyrighted work. Further, defendant's infringement was willful because defendant was made aware of plaintiff's valid ownership of a copyright registration in Shadows when Teller and Dogge started to discuss the issue on or about March 15, 2012. Despite Dogge being made aware by Teller that one of his infringing videos had been taken down from YouTube, he left a second, nearly identical, video he had posted on YouTube to remain up with full knowledge that it was infringing.[4] Accordingly, there can be no doubt that Dogge's conduct was willful, and that the award of maximum statutory damages is warranted.

### c.   *Dogge is Liable for Unfair Competition*

Dogge's actions also amount to unfair competition.[5] Unfair competition is a broad doctrine that is meant to cast a wide net. *See* 9 Bus. & Com. Litig. Fed. Cts. § 105:20 (3d ed.) ("The law of unfair competition is best understood as a broad and flexible doctrine whose application depends more upon the facts set forth in the individual case and less upon technical requirements."). The Lanham Act provides that anyone who "uses in commerce, any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

---

[4]  This second video was also subsequently removed from YouTube though another formal DMCA takedown notice  by plaintiff.

[5]  Although the court denied summary judgment as to the unfair competition claim due to outstanding issues of fact, the court noted that "the testimony of Teller's expert certainly serves as evidence from which a reasonable person could conclude that there is a likelihood of confusion as to Teller's involvement with Dogge's videos."  *See* Order on Summary Judgment, doc. no.184.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1  description of fact, or false or misleading representation of fact, which" . . . "is likely to cause

2  confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such

3  person with another, or as to the origin, sponsorship, or approval of his or her goods, services, or

4  commercial activities by another person" 15 U.S.C. § 1125(a)(1).  "A claim of unfair competition

5  under the Lanham Act encompasses trademark infringement, but also includes a broader range of

6  unfair practices, which may generally be described as the misappropriation of the skill, expenditures

7  and labor of another." *See* 87 C.J.S. Trademarks, Etc. § 142.

8     A celebrity plaintiff may prove an unfair competition claim where the defendant uses

9  elements of the **celebrity's persona** without permission to suggest **false association** or endorsement

10  of the defendant's goods or services. *See White v. Samsung Electronics Am., Inc.*, 971 F.2d 1395,

11  1399-1400 (9th Cir. 1992) (holding that a celebrity plaintiff may succeed on a Lanham Act claim by

12  proving the defendant created a likelihood of consumer confusion as to whether the plaintiff

13  endorsed or was associated with the defendant's goods or services); *Waits v. Frito-Lay, Inc.*, 978

14  F.2d 1093, 1106 (9th Cir. 1992) (same); *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410

15  (9th Cir. 1996) (holding that false endorsement claims based on the unauthorized use of a celebrity's

16  identity are properly cognizable under section 43(a), 15 U.S.C. § 1125(a)).

17     Moreover, courts have recognized false endorsement claims brought by celebrity plaintiffs

18  for the unauthorized imitation of their distinctive attributes where those attributes amount to an

19  unregistered trademark. *Waits v. Frito-Lay*, 978 F.2d at 1106.  Notably, a celebrity's distinctive

20  attributes may include objects or items that have become so associated with the celebrity that a

21  consumer's mind would immediately turn to the celebrity upon seeing the item.  *See*

22  *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, (9th Cir. 1974) (holding that the

23  distinctive appearance of a race car driver routinely made to his race car became identifiers of the

24  driver himself).

25     In such cases, the celebrity needs only show that the defendant created a likelihood of

26  confusion regarding whether the celebrity was endorsing *or was associated with* the defendant's

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

goods or services. *White v. Samsung*, 971 F.2d at 1400.[6]  Here, Dogge chose to market his product by targeting magicians and those familiar with Teller by tagging his advertisement video with key tags such as "Penn", "Teller," Las Vegas, and by advertising in a magic magazine.  Dogge clearly intended to draw an association with Teller in the mind of the consumer by developing a rose prop that is destroyed when it's shadow was cut as opposed to some other object (a Christmas tree where the ornaments fall off on command, for example).  Further, even given that the product was a rose flower prop, Dogge could have advertised the prop's capabilities in a number of ways – as he did in later videos – without reproducing Teller's famed illusion thus using Teller's goodwill to sell his product.  There can be no doubt that Dogge hoped to create a mental association with Teller in the minds of his audience, first by using his most famous illusion, and then also using his name and the place that he performs, Las Vegas.

### 3.  The Sum of Money at Stake in the Action

Courts evaluating the sum of money at stake in the action must look to the amount of money sought in relation to the seriousness of the defendant's conduct; in other words, it is a consideration of proportionality.  *See Holiday Systems International of Nevada*, 2012 WL 5334647, *4.  Here, Teller seeks injunctive relief, statutory damages, and attorneys' fees and costs.  Statutory damages are per se reasonable damages, as they are what Congress prescribed for this type of action; by definition, they are proportional to the harm.  As such, this factor weighs in favor of default judgment.  As noted above, Dogge's actions reveal his clear willfulness and intent to copy Teller's illusion thus warranting the maximum amount of damage permitted under the statute.

### 4.  The Possibility of a Dispute Concerning Material Facts

There is also no possibility of dispute concerning material facts.  As noted above, on an application for default judgment, all facts in the complaint are taken as true as a matter of law.  *See Lagos v. Monster Painting, Inc.*, 2013 WL 5937661, *2.  Further, by defendant's repeated misconduct culminating in this court's striking Dogge's answer and entering default against him,

---

[6] The Ninth Circuit has set forth a slightly modified version of the traditional *Sleekcraft* factors that courts may consider in determining whether there is the requisite showing of likelihood of confusion.  These factors are discussed in detail in Teller's motion for summary judgment on unfair competition, incorporated herein by reference.

1 Dogge has effectively forfeited his right to dispute the facts of this case. As such, there is no

2 dispute, and this factor weighs in favor of default judgment. *See Holiday Systems International of*

3 *Nevada*, 2012 WL 5334647, *5; *BMW*, 2013 WL 1338233, *4.

### 5. Whether the Default Was Due to Excusable Neglect

5 Courts must also examine whether the default was due to excusable neglect. It was not; in

6 this case, the default was due to Dogge's repeated misconduct, including refusal to follow numerous

7 court orders and refusal to physically attend trial. This was certainly not excusable neglect, and as

8 such, this factor weighs in favor of default judgment.

### 6. The Strong Policy Favoring Decisions on the Merits

10 Although there is a strong policy in favor of decisions on the merits, as one court points out,

11 "the mere existence of Rule 55(b) demonstrates that this preference, standing alone, is not

12 dispositive." *See Holiday Systems International of Nevada*, 2012 WL 5334647, *5 (internal

13 quotations omitted). Further, as noted above, Dogge has forfeited his right to contest the merits by

14 repeated misconduct before the court, resulting in the sanction of default. As such, this factor

15 weighs in favor of default judgment.

16 As each of the above factors weighs in favor of a default judgment, this court should enter

17 default judgment in favor of Teller.

### C. Plaintiff is Entitled to Maximum Statutory Damages Under the Copyright Act, a Permanent Injunction, and Attorneys' Fees and Costs.

20 This court should grant each requested remedy to plaintiff upon grant of default judgment.

21 Specifically, plaintiff requests statutory damages, injunctive relief, and attorneys' fees and costs.

### 1. Statutory Damages of $150,000 are Proper Under the Copyright Act

23 Statutory damages of $150,000 pursuant to the Copyright Act are proper. As this court has

24 already determined that Dogge is liable to Teller for copyright infringement, this court must now

25 make a determination as to damages. Under the Copyright Act, statutory damages are available to a

26 copyright owner whose effective date of registration is prior to the time the infringement begins. *See*

27 17 U.S.C. § 412. A copyright owner "may elect, at any time before final judgment is rendered, to

28 recover, instead of actual damages and profits, an award of statutory damages for all infringements

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

involved in the action."  17 U.S.C. § 504(c)(1).  Here, Teller has elected statutory damages; Teller is unquestionably eligible for statutory damages because Teller's effective date of registration, January 6, 1983, is well before Dogge's infringing activity in March of 2012.

The court must determine the amount of the statutory damages to award.  For non-willful infringement, damages may range between $750.00 and $30,000, as the court considers just.  *See* 17 U.S.C. § 504(c)(1).  Where the infringement is willful, the court may increase the award "to a sum of not more than $150,000" per work infringed.  *See id.* at § 504(c)(2).  In measuring the damages, a court "is to be guided by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement, and the like…"  *See Warner Bros. Home Entertainment, Inc. v. Slaughter*, 2013 WL 5890682, *5 (C.D. Cal. 2013).  The purpose of statutory damages is not only to account for restitution of profit and reparation for injury, but also to discourage further wrongful conduct.  *See N.A.S. Import, Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250 (2d Cir. 1992), quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952).

Here, Dogge's conduct was willful and in bad faith, as alleged in the complaint and now accepted as true under the default.  Dogge knew what he was doing was wrong, yet he did it anyway.  This is precisely the type of willful conduct that the Copyright Act seeks to discourage.  Accordingly a damages award of $150,000.00 is warranted. *See, e.g., Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990) (awarding maximum statutory damages for each of eighty infringements and noting that "the Supreme Court has stated that even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within the statutory limits to sanction and vindicate the statutory policy of discouraging infringement.") (internal quotations and citations omitted).

2. **Permanent Injunctive Relief is Proper**

*a.  This Court Should Enter a Permanent Injunction*

This court should enter a permanent injunction as a remedy for Dogge's unfair competition and copyright infringement.  A permanent injunction is the remedy of choice for unfair competition actions. *See Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F.Supp.2d 1072 (C.D. Cal. 2012), quoting

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 891169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir.1988). Likewise, the

2   Copyright Act provides that a court may grant permanent injunctive relief "on such terms as it may

3   deem reasonable to prevent or restrain infringement of a copyright." *See* 17 U.S.C. §502(a).

4           An injunction is appropriate where Teller can show that he has suffered an irreparable injury,

5   that remedies available at law are inadequate, that considering the balance of hardships between

6   Teller and Dogge, a remedy in equity is warranted, and that the public interest would not be

7   disserved by a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S.Ct.

8   1837, 1840, 164 L.Ed.2d 641 (2006). Each of these factors favors a permanent injunction against

9   Dogge.

10           First, in unfair competition actions, once the plaintiff establishes a likelihood of confusion, it

11   is generally presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.

12   *See Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F.Supp.2d 1013 (C.D. Cal. 2011), ci*ting Vision*

13   *Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir.1989). Likewise, "[w]hen liability for

14   copyright infringement has been established, a permanent injunction will be granted if there is a

15   threat of continuing violations." *Curtis v. Illumination Arts, Inc*. 2013 WL 2389842, *11 (W.D.

16   Wash. 2013), citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir.1993).

17   Liability for copyright infringement has already been established, and Dogge's actions indicate that

18   infringement is likely to continue absent an injunction. Teller has shown a likelihood of confusion,

19   as discussed above and in the complaint, which is taken as true, and as Teller has shown that his

20   goodwill, profits, and reputation would be damaged if this activity was allowed to continue. Further,

21   in cases where a money judgment is unlikely to be collectible, a finding of irreparable harm is

22   warranted. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 518 F.Supp.2d 1197 (C.D.

23   Cal. 2007). This is likely the case here, as Dogge has stated that he has no income and little savings,

24   and has openly ridiculed the idea of paying the attorneys' fees that have been awarded against him

25   on his website. As Teller can show irreparable harm, this factor favors a permanent injunction.

26           Second, remedies available at law – such as money damages – are inadequate. This factor

27   weighs in favor of a permanent injunction where there is no assurance that the defendant will not

28   continue the unlawful activity. *See Sennheiser Electronic Corp. v. Eichler*, 2013 WL 3811775, *4-5

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1  (C.D. Cal. 2013).  Further, "[d]amages are no remedy at all if they cannot be collected, and most

2  courts sensibly conclude that a damage judgment against an insolvent defendant is an inadequate

3  remedy."  *See Grokster*, at 1220-21.  Money damages – if even collectible – would not adequately

4  address the injuries Teller would sustain if Dogge's infringing activity were to continue, and thus

5  this factor favors a permanent injunction as well.

6  Third, the balance of hardships weighs in favor of Teller.  Where there is no indication that

7  an injunction would cause a defendant to suffer hardship, but where the injunction would "merely

8  assure its compliance with the Lanham Act" a permanent injunction is warranted.  Here, an

9  injunction would only proscribe what Dogge should never have been doing in the first place –

10 infringing Teller's copyright, and unlawfully trading on Teller's and his act "Penn and Teller's"

11 goodwill.  Even if Dogge were to argue that his intent had changed, and further manufacturer, sales

12 and distribution would not be based on inducing others to perform Shadows, "it is entirely too easy

13 for an adjudicated infringer to claim a reformation once the specter of a permanent injunction looms

14 near," and such claims should be viewed with skepticism.  *See Grokster*, at 1221.  This factor weighs

15 in favor of Teller as well.

16 Fourth, as to the public interest, the public has a right "not to be deceived or confused," and

17 the public interest lies in the enforcement of the principles recognized by Congress in creating the

18 Lanham Act.  *See Sennheiser*, 2013 WL 3811775, *11.  Similarly, the public interest is served when

19 the rights of copyright holders are protected against acts likely constituting infringement.  *See*

20 *Grokster*, at 1222, quoting *Perfect 10 v. Amazon.com, Inc.,* 487 F.3d 701 (9th Cir.2007).  This factor

21 weighs in favor of a permanent injunction against Dogge.

22 As all four factors weigh in favor of a permanent injunction, this court should enter a

23 permanent injunction against Dogge.

24 ### *b.  A Permanent Injunction Should Contain the Following Provisions*

25 This court should enter a permanent injunction that forbids Dogge from selling his flower

26 prop and forbids Dogge from trading on Teller's goodwill to sell any goods or services in the future,

27 including reproducing any of Penn & Teller's unique illusions.  Specifically, Teller requests that this

28 court enter an injunction with the following provisions:

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

i)      Dogge[7] is enjoined from infringing Teller's copyright in Shadows, and from producing, manufacturing, selling, or otherwise distributing the Rose flower prop[8];

ii)     Dogge is enjoined from trading on Teller's goodwill and reputation to provide Dogge's profits in the future.  Teller performs primarily with Penn & Teller; accordingly, this includes building, using or selling props to allow Dogge or others to perform any Penn & Teller's illusions, or assisting others in doing the same.

iii)    Dogge is enjoined from using in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact that is likely to cause confusion, to cause mistake, or to deceive regarding the origin, sponsorship, or approval of Dogge's goods and services or falsely to imply a connection, affiliation, endorsement, or association with Teller or Penn & Teller;

iv)     Dogge is enjoined from unfairly competing with Teller or Penn & Teller in any manner whatsoever;

v)      Dogge is enjoined from causing likelihood of confusion or further injuring Teller's business reputation.

---

[7] References to Dogge in this section include any of his alter egos, agents, employees, or other representatives.

[8] Although the prop might have other legitimate purposes, purchasers of the prop would be far more likely to perform Teller's famous illusion with the prop than create a new illusion. Distribution of the prop would likely induce others to infringe Teller's copyrights, given that Dogge intended  to induce infringement by others by selling a prop that would likely be used to perform Teller's illusion.  *See* Declaration of Jim Steinmeyer; **Exhibit 8**, ¶¶ 6, 8.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913, 125 S.Ct. 2764 (2005) ("the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe.  In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of *the tool intended for infringing use*.") (emphasis added).

The sale of these props would cause Teller to have to continue to bring enforcement actions and engage in a high degree of monitoring.  Sale of the props would also make it much more likely that others would be doing this illusion, and that in turn would cause further damage to Teller.  Once a number of other magicians were performing the illusion and it was no longer unique to him, he would be forced to replace it with something new (thus incurring the expense of development), and he would lose something essentially irreplaceable – an illusion of great value that he's been performing for so many years.  Teller would also essentially lose the ability to sell it, as, for example, Gay Blackstone (Harry Blackstone, Jr.'s wife) was able to license Harry Blackstone's floating light bulb illusion to magicians and was able to sell other of his illusions to amateurs directly.  If this prop was commonly available and the illusion was infringed, Teller would lose dramatically in a number of important ways and it is for this reason that he thinks that the sale of the prop will simply lead to further infringements.  *See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, Ltd., 518 F.Supp.2d 1197 (C.D. Cal. 2007) (holding that where copyrighted works have been and will be exposed to infringement on a tremendous scale as a result of the defendant's actions, this weighs in favor of an injunction).

### 3.  **Attorneys' Fees and Costs are Proper**

#### a.  *Entitlement to Costs*

This Court should enter an award of $57,906.95 for costs incurred by plaintiff.  Plaintiff would not have incurred these costs but for the bad faith intent of defendant to profit from plaintiff's good will.  Consequently, the court should award plaintiff $57,906.95 in costs.  *See* Tratos Affd., ¶¶ 6-12.

#### b.  *Entitlement to Attorneys' Fees*

##### i.  *Copyright Attorneys' Fees*

This Court has already determined that Teller is entitled to attorneys' fees under the Copyright Act.  *See* Order dated March 20, 2014 (doc. no. 184).

##### ii.  *Unfair Competition Attorneys' Fees*

Teller is also entitled to attorneys' fees under the Lanham Act as a result of Dogge's unfair competition.  The Lanham Act provides that the court may award reasonable attorneys' fees to the prevailing party in "exceptional" cases.  *See* 15 U.S.C. 1117.  "While the statute does not define the term 'exceptional,' generally a case is exceptional when the court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully."  *King Taco Rest., Inc. v. King Taco Express, Inc.*, 2010 WL 2817200 (D. Nev. 2010).  Where default judgment has been awarded, and the complaint alleges willful actions, the defendant's conduct <u>will be considered willful</u> for the purposes of awarding attorneys' fees.  *King Taco,* at *2.  Moreover, it has been considered an abuse of discretion for a trial court to fail to award attorneys' fees where the infringer's conduct is willful.  *See Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1276 (9th Cir. 1982) ("In light of PEI's well supported arguments and the trial court's finding that the defendants deliberately [infringed], it is our opinion that the lower court abused its discretion by not considering such actions as 'exceptional.'").

#### c.  *Information Required for Attorneys' Fees Pursuant to Local Rule 54-16*

Pursuant to Local Rule 54-16, plaintiffs provide the following information:

1. <u>Itemization and description of the work performed:</u>

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

1   The itemization and description of the work performed accompanies the Affidavit of Mark G.

2   Tratos, filed concurrently herewith.

3       2.   Itemization of non-taxable costs sought as part of fee award:

4   None.

5       3.   Nature of the case:

6   This was an action for unfair competition under 15 U.S.C § 1125(a) and copyright

7   infringement under 17 U.S.C. § 101 et seq.

8       4.   Difficulty of the case:

9   The claims of this case were moderately difficult.   The primary claims asserted were

10  copyright infringement and unfair competition.   Intellectual property law is considered a specialized

11  area of law.   The actions of the Defendant Dogge made the case very difficult requiring an extensive

12  and expensive motion practice.

13      5.   Results obtained and amount involved:

14  Plaintiff obtained summary judgment on a major portion of the case, and also obtained an

15  entry of default, both of which are favorable to plaintiff.   The lawsuit involves unfair competition

16  and copyright infringement; for copyright infringement, the amount involved is the statutory

17  damages range, which is up to $150,000.   As to the unfair competition aspect, the amount involved

18  is not readily ascertainable.   Unfair competition is considered a tort for which injunctive relief is the

19  remedy of choice, and that relief has been sought and obtained here.

20      6.   Time and Labor Required:

21  This case involved a significant amount of time and labor.   Plaintiff filed his Complaint in

22  April of 2012; due to Dogge's evading service, plaintiff was forced to serve by publication in

23  Europe, which was costly and time-consuming.   Even after Dogge was served, litigating the case

24  was made exceptionally difficult and costly due to Dogge's constant frivolous filings.   As outlined in

25  the motion for case-terminating sanctions and in the facts section above, Teller was forced to file or

26  oppose dozens of discovery motions unnecessarily.   After summary judgment was granted and

27  plaintiff attempted to prepare for trial, Dogge refused to participate in trial preparation, stating in a

28  letter written in Dutch that he would not appear in person for trial.   Teller was forced to translate the

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 891169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

letter and file additional motions; ultimately, plaintiff was forced to prepare a trial brief, exhibit list, trial exhibits, findings of fact and conclusions of law, settlement statement, and engage in other costly trial preparation despite the fact that Dogge had stated he would not attend trial.  Ultimately, plaintiff's motion for case-terminating sanctions was granted, resulting in the striking of Dogge's answer and the entry of default, leading to the filing of the instant motion.

7.  <u>Novelty and Difficulty of the Questions Involved:</u>

This case was, to counsel's knowledge, the first pantomime copyright case to be litigated to published opinion.  However, the true difficulty in this case was seeking discovery from an individual who refused to produce any of the key documents in the case and who refused to enter protective orders even when ordered to do so by the Federal District Court Judge and who continuously refused to follow court's orders, requiring the filing of numerous motions to compel and hearings before the Magistrate Judge.  Teller was also required to respond to numerous frivolous filings by the Defendant.

8.  <u>Skill Requisite to Perform the Legal Services Properly:</u>

A high degree of skill was required to perform the legal services properly.  As stated above, intellectual property is considered a specialized area of law requiring considerable knowledge and experience.

9.  <u>Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case:</u>

Plaintiff's counsel's firm is of significant capacity, such that though individual lawyers may have at times during the pendency of this action been working at capacity on this matter, the firm was not, and the firm's other lawyers were not precluded from performing other work.

10.  <u>The Customary Fee:</u>

The plaintiff's counsel charged their customary rates while working on this case, but deferred half of the fees until a judgment was rendered.

11.  <u>Whether the Fee is Fixed or Contingent:</u>

The fee was not a fixed fee or fully contingent on the outcome of the litigation of this matter. The client was billed at an hourly rate, half of which was deferred until judgment entered.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

12. <u>The Time Limitations Imposed by the Client or the Circumstances:</u>

Plaintiff did not impose any time limitations.  Plaintiff was being irreparably harmed by defendant's actions, and therefore plaintiff's counsel was required to act promptly.

13. <u>The Experience, Reputation, and Ability of the Attorneys Involved:</u>

Greenberg Traurig has an excellent reputation within the legal community and the attorneys working on this case are highly skilled.  The lead attorney, Mark G. Tratos, has worked extensively on intellectual property litigation for the past 35 years.  He has been AV rated by Martindale Hubble for 25 consecutive years.  He has been named Best Lawyers for over a decade and has been designated Lawyer of the Year twice in IP Litigation and one in Trademarks.  He was named in the Top One Hundred Lawyers in the Mountain West in 2014 by Super Lawyers.  He has been a member of the Adjunct Faculty of UNLV Boyd School of Law for more than a decade teaching Entertainment Law, Cyber Law and Rights of Publicity, Privacy and Defamation Law.  The other attorneys who participated heavily in this case, namely Bethany L. Rabe, Peter H. Ajemian, and Nancy R. Ayala, also devote the majority of their practices to intellectual property.  As practicable, work was delegated to the attorney on the case with the lowest billing rate.

14. <u>The Undesirability of the Case, if Any:</u>

This case could not be characterized as undesirable.

15. <u>The Nature and Length of the Professional Relationship with the Client:</u>

Greenberg Traurig, and Mark G. Tratos in particular, has represented plaintiff for a number of years.

16. <u>Award in Similar Cases:</u>

Plaintiffs' counsel does not know whether the award would be similar to the awards in other cases.  The amount of attorneys' fees and costs incurred is comparable to the amount charged by Greenberg Traurig for other similar cases involving extensive motion practice and trial preparation.

**Accordingly**, this court should enter an award of attorneys' fees in favor of plaintiffs in the amount of $931,661.65.  This court should also enter an award of $57,906.95 for costs incurred by plaintiff.  Plaintiff would not have incurred these fees and costs but for the bad faith intent of defendant to profit from plaintiffs' good will.  Consequently, the court should award plaintiff

1  $989,568.60 in attorneys' fees and costs.  *See* Tratos Affd., ¶¶ 6-12; and exhibits A and B attached

2  thereto.

3  **IV.**    **CONCLUSION**

4        In light of the foregoing, Teller respectfully requests that this court enter default judgment as

5  follows:

6        1.   Award damages in the amount of $150,000.00 for Dogge's willful

7             copyright infringement;

8        2.   Enter a permanent injunction enjoining Dogge from further copyright

9             infringement or unfair competition against Teller or Penn and Teller;

10       3.   Award attorneys' fees in the amount of $931,661.65;

11       4.   Award costs in the amount of $57,906.95;

12       5.   Reserve jurisdiction to award plaintiffs further attorneys' fees and

13            costs incurred in the prosecution and defense of this and related

14            matters after default judgment has been entered

15       6.   Such other and further relief as the court may deem just and proper.

16   Dated this 19th day of August, 2014

17                    GREENBERG TRAURIG, LLP

18                    */s/ Mark G. Tratos*
                      Mark G. Tratos (Bar No. 1086)

19                    Peter H. Ajemian (Bar No. 9491)
                      Nancy R. Ayala (Bar No. 7146)

20                    3773 Howard Hughes Pkwy, Suite 400 North
                      Las Vegas, NV  89169

21

22                    *Counsel for Plaintiff*

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that on August 19, 2014, service of the foregoing **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND PERMANENT INJUNCTION AGAINST DEFENDANT GERARD DOGGE** was made this date through the Court's CM/ECF electronic filing system, via registered electronic mail and United States mail, postage prepaid to:

Gerard Dogge
Hoevensebaan 2
2950 Kapellen
Belgium – Europe
Gerard-bakardy@hotmail.com


*Cynthia L. Nev*
An employee of Greenburg Traurig

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

# Exhibit 1

Mark G. Tratos (Bar No. 1086)
tratosm@gtlaw.com
Nancy Ayala (Bar No. 7146)
ayalan@gtlaw.com
Peter H. Ajemian (Bar No. 9491)
ajemianp@gtlaw.com
GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Teller, an individual,<br><br>      Plaintiff,<br><br>v.<br><br>Gerard Dogge (P/K/A, Gerard Bakardy) an individual,<br><br>      Defendant. | Case No. 2:12-cv-00591-JCM-GWF<br><br>**DECLARATION OF TELLER**<br>**IN SUPPORT OF MOTION FOR**<br>**DEFAULT JUDGMENT AND**<br>**PERMANENT INJUNCTION AGAINST**<br>**DEFENDANT DOGGE** |

I, Teller, declare

    1.    I am a professional entertainer, writer, director, and magician and half of the magic and comedy duo Penn and Teller. Penn and I have been working together since 1975 and are known in the United States and abroad for our original material and frank style. We perform in the live theater and on television. Our theater show (hereinafter the "Show") has run off and on Broadway, toured nationally and internationally. We have starred in our own television specials and made guest appearances on hundreds of TV shows such as "Late Show with David Letterman," "The Tonight

Show with Jay Leno," "Friends," "The Simpsons," "Dharma & Greg," "Alpha House," "Celebrity Apprentice" and "Top Chef." Last month Penn and I completed a three-week tour of the United Kingdom. We were invited by Prince Charles to give a performance at Windsor Castle, where we performed at a benefit dinner for his charitable trust. Sample articles about our international work are attached hereto as **Exhibits A and B**.

2.     Additionally, Penn and I have been nominated thirteen times for Emmys on our investigative television series, "Penn & Teller: BS!," on the Showtime network, which ran eight seasons and was the longest running show in the network's history.  We hosted and co-wrote an Emmy-nominated series for the FX network, and did one season of a series for the Discovery Channel in a show that challenged viewers to detect deception in documentary stories.  We have done two television series in Britain, and this summer are seen in two cable series in the U.S.: "Penn & Teller: Fool Us" on the CW and "Wizard Wars" on the SyFy network.  Together Penn and I have written three books (two national bestsellers) and I have written two on my own.  We appeared in (and Penn produced) the critically lauded feature film "The Aristocrats."  Last year I executive produced and directed the documentary "Tim's Vermeer," which was shortlisted for the Oscars and nominated for a BAFTA in Britain.  I also direct theater:  My comic/horror play "Play Dead" ran off Broadway in New York for 9 months and another four months last year in Los Angeles.  My version of Shakespeare's "Macbeth" ran at the Folger in Washington, DC. This year I co-created a magic-infused production of Shakespeare's "The Tempest," which ran at the Smith Center in Las Vegas, the American Repertory Theater in at Harvard, and is about to open at South Coast Repertory theater in California.

3.     Penn and I believe in sharing our success in show business by doing charity work. We are annually grand marshals of the AFAN walk and match the contributions of our supporters. We support and raise money for Opportunity Village, an institution that assists mentally handicapped persons in finding useful work. We provide free tickets at holiday times to those who contribute blood to United Blood Services. And we mentor talented and creative performers.

4.      Currently, Penn and I perform our live Show at The Rio All-Suite Hotel & Casino in Las Vegas, Nevada ("The Rio"), where it has been running for thirteen years, making us the longest running headliners in Las Vegas.  Our run at The Rio has earned us the award of "Las Vegas Magicians of the Year" six times.

5.      I have created many of the original pieces that have been featured in our Show over the years. My most successful and lasting original piece is a dramatic magical vignette called "Shadows," which is the subject of the instant litigation.

6.      I created the unusual dramatic work "Shadows" in 1975, and obtained a U.S. Copyright Registration for it in 1983.

7.      "Shadows" begins with a spotlight trained on a single rose in a small vase.  The light casts the shadow of the real rose onto a white screen positioned behind it.  I then enter the scene with a glittering knife, and proceed to cut apart the rose's shadow; in response the real leaves and petals droop, break off, and flutter to the stage.  To the best of my knowledge, my copyrighted piece "Shadows" is the first illusion in stage magic to dismember a flower by acting on its shadow.

8.      I have performed "Shadows" live in the Penn & Teller Show tens of thousands of times throughout the United States and overseas.  In fact, "Shadows" has appeared in every Penn & Teller Show performed on and off Broadway and in our national tours.  It is the oldest piece of material in continuous use in our Show (from our first stage shows in 1975 to the present day at the Rio in Las Vegas).  While other material has come and gone, "Shadows" has remained an icon of our show, an audience favorite, and my signature piece.  Millions of people in the United States and around the world have seen me do it.  Magicians recognize it as one of the rare new plots in the canon of 20th Century magic and is my principal claim to fame in magic history.

9.      Defendant Dogge viewed a recording of "Shadows" on the Internet and reproduced the visible action of the illusion.  He then created an advertisement for the sale of "The Rose & Her Shadow" trick, and told me that he intended to place this ad in a magic magazine.  Dogge's listed selling price for "The Rose and Her Shadow" was an amount equal to approximately USD $3,050.00.  A true and correct copy of the intended magazine advertisement for the sale of the magic

trick and Dogge's products is attached to the Motion as Exhibit 7. Dogge also posted two video advertisements for my copyrighted trick on the Internet. In it he copied my presentation unmistakably and tagged it with my name.

10.     I contacted Dogge and tried to resolve this problem amicably by making an ethical appeal and a fair money offer to keep his copy of my work off the market. He countered with a demand for money that was extortionate. When I informed him that my creation was protected by copyright, he reminded me that even if he didn't produce the equipment himself, he always had the option "to sell to a clever Chinese."

11.     On April 11, 2012, Dogge emailed me to state that if we did not come to an agreement before April 13, 2012, he would begin "selling to the public." As this would not only infringe my copyrighted dramatic work, but also undermine "Shadows" as my signature piece, I was forced to retain counsel to remedy Defendant's infringement.

12.     To date, legal bills for this case have been $931,661.65 in fees and $57,906.95 in costs. Additionally, I have had to defend myself from a frivolous defamation action filed by Dogge in Belgium. We prevailed at trial, but Dogge has now appealed and the matter is yet pending in Belgium. I have paid those fees separately which now total € 62,787.82 (roughly US$85,000.00).

13.     I am convinced that even after losing the copyright case, Dogge will continue to try and plunder my unique material. His threat to "sell to a clever Chinese" was explicit. During my deposition, he persistently asked me which of my other original illusions were copyrighted; in particular he asked whether my SilverFish illusion (an audience favorite in my show: the transformation of coins into live fish in a clear tank) was protected. Given his stated contempt for the laws of the United States and the integrity of this Court, I believe he functions as a common pirate, who will stop at nothing for his own gain. I fully expect Gerard Dogge to continue to develop knockoff versions of Penn & Teller props to sell to others to perform our illusions, unless enjoined from doing so by this Court.

14.     If he does so, my work will lose its uniqueness, and proportionally its value in the eyes of the public and the magic community. The rule Penn and I follow in creating our Show is:

"A piece cannot be in our show if a spectator can see it anywhere else." If Dogge puts copies of my creations into the shows of other people, those pieces could be forced out of our show. I cannot guess at the financial impact such infringement would have on me, but the artistic consequences are dire when one has spent decades perfecting theatrical presentations.

15.     I hope (possibly after my retirement) to license "Shadows" (and perhaps some of my other original creations) to a very small number of carefully selected and talented performers in magic or pantomime. These performers would pay a royalty, give proper credit, and – most important -- do justice to the works I've spent my life creating. This licensing becomes unfeasible if my works have been pirated, distributed, and exploited by others.

I declare under penalty of perjury and under the laws of the State of Nevada that the foregoing is true and correct.

Executed this 18th day of August, 2014 at Las Vegas, Nevada.

_____
Teller

# EXHIBIT A



New User? Register | Sign In | Help          Get the News Digest app                    ✉ Mail    🏠 Yahoo

**YAHOO! TV**
UK & IRELAND

| HOME | NEWS | FEATURES | SOAPS | REALITY TV | **MORE SHOWS** | PHOTOS | VIDEO | BLOG |

THIS MORNING   DAYBREAK   JEREMY KYLE   DOCTOR WHO   GAME OF THRONES   HANNIBAL   GREAT BRITISH BAKE OFF   DOWNTON ABBEY   HOMELAND

WATERLOO ROAD   SHERLOCK   WWE

# Penn and Teller bring card tricks to Good Morning Britain

The duo fooled Susanna Reid and John Stapleton as they promoted their UK tour.

By Rachel MacGregor | Yahoo Contributor Network – Wed, Jun 18, 2014 10:53 BST



📷 View Photo

Yahoo Contributor Network - Popular illusionists Penn and Teller spoke about their 40 year career.



📷 View Photo

Teller revealed the card details on his eyes.

Most guests on 'Good Morning Britain' make a comment about getting up early to be on the show, but illusionists Penn and Teller went one step further to make themselves more comfortable, appearing on the programme in their pyjamas. Teller even spent the first part of the interview pretending to be asleep.

This was all a part of a trick that they were to present to Susanna Reid and John Stapleton, who cautiously took a card from Penn, while Teller was still 'snoozing' on the sofa.

As Stapleton showed the camera his chosen card - the three of clubs - Penn tried to pick it out once it had been placed back in the deck and appeared to struggle to find it. Teller saved the day as he opened his eyes to shockingly show the number 3 on one pupil and the club symbol on another.

The trick left Susanna Reid absolutely gobsmacked as she joked, "I kind of preferred it when you had your eyes closed." When the presenter asked how the trick was done Penn was coy, stating that it "was a miracle," before discussing his working relationship with Teller, who he has been performing with for almost 40 years.

In that time they've combined comedy with illusion and have become Vegas royalty, where they've headlined a show at The Rio for the last 13 years. During their career they've written a number of best-selling books, guest starred on popular television shows including 'Friends', 'Futurama', 'Saturday Night Live' and 'The Simpsons', and have even made their own Emmy-nominated programmes.

LATEST DAYBREAK STORIES                    1 - 6 of 18   ◄ ►


Campaign to keep Sean Bean's latest TV character alive goes


Tom Daley shares hopes for the Commonwealth


Guardians of the Galaxy's Karen Gillan on becoming Nebula


Dame Helen Mirren's 12-minute exercise regime revealed


Holby City: Who's the daddy – Raf or Harry?


Which TV shows are Mick Jagger and Ronnie Wood

Get Yahoo apps on mobile


Mail


Weather


Flickr

TODAY ON YAHOO                    1 - 8 of 48   ◄ ►


Was McIlroy flaunting wealth or just having


Rottweiler races in to save Chihuahua from

They revealed that one of their secrets to success is the fact that their off-stage relationship isn't as close as most would think. "It's more of a business relationship," Penn explained. "A lot of problems with teams like Lennon and McCartney or Martin and Lewis is that they really had a real affectionate bond and when there's any sort of conflict it's heart-breaking.

"Teller and I started out with much more respect than affection, we had much more concern for the show although, after 40 years, he's my closest friend - we spend like 60 hours a week together."

Now that the duo are in the UK, they're set to perform at the Hammersmith Apollo until June 22, and they revealed that there's no resentment in the industry over their decision to reveal how certain tricks are done. "That was mostly hype," Penn explained. "We wanted to separate ourselves from magicians.

"As Seinfeld said, all magic is, 'here's a quarter, now it's gone, you're a jerk, now it's back, you're an idiot, show's over' and we wanted to break that down and show people that we were on their side."

They've certainly done that, as they are two of the biggest illusionists in the world and fans love their comedic presence on stage. After 40 years they're going strong, and it seems there's no slowing down Penn and Teller, even with the early morning starts...

*Rachel MacGregor is obsessed with film and television. She loves sitcoms, adaptations and great British drama. Follow Rachel on Twitter.*

More articles from Rachel:

World Cup 2014: All the songs to listen out for

Samuel L. Jackson on Hollywood taking over London

Behind the scenes of Cheryl Cole's 'Crazy Stupid Love' video

 @yahootvuk on Twitter

---

## FROM AROUND THE WEB  Sponsored



15 Notorious Celebrity Gold Diggers
(MadameNoire)



9 Celebrities Who Aren't Aging Well (and 1 Who Came Back From the…
(Grandparents.com)



Did You Know These Celebrities Are Also Great Basketball Players?… (Zonable)



14 Surprising Things You're Doing Wrong With Your Dog…
(Poundwishes)

---

## WE RECOMMEND



Iraqi Militants Execute 500: Some Buried Alive



Russian Navy 'Chases Away American Submarine'



Moffat Doctor regeneration dilemma



Russian Warship Escorted Away from English Channel by HMS Destroyer

---



Moment of horror as pram rolls onto tracks



'Uncanny coincidence' with Robin Williams's



These pedestrians are about to get a huge



New X Factor 'cheating' scandal



Should World Cup star choose United or



Robin Williams' long struggle with addiction

## LATEST PHOTOS

1 - 4 of 12  



'24: Live Another Day'



TV Highlights: 26 April - 2 May. We preview Good Morning Britain,



TV Highlights: 19-25 April. We preview Fargo, Jamaica Inn



Gladiators: Where Are They Now?

# EXHIBIT B

August 12, 2014

Currently: 91° — **Complete forecast** | **Log in** | **Create an account**



NEWS | VEGAS INC - BUSINESS | OPINION | SPORTS | POLITICS | ENTERTAINMENT | LAS VEGAS WEEKLY | ROBIN LEACH'S VEGAS DELUXE

Betting Lines | Joe Downtown | UFC | Las Vegas Sol | Courts | Photos | Rebels | The Sunday

SEARCH

**0 Comments**

# Strip Scribbles: Prince Charles, Penn & Teller; 'Marriage Can Be Murder'; WFC downtown



COURTESY

Rio headliner magicians Penn & Teller flank the manager of the Hammersmith Apollo on Monday, June 23, 2014, in London.

By **Robin Leach** (**contact**)
**Tuesday, June 24, 2014 | 4:58 p.m.**

It was a case of life imitating art imitating life at Monday night's performance of **"Marriage Can Be Murder"** at the downtown D Las Vegas. One of the actors planted in the audience performed his "death" but actually passed out and fell to the ground.

Medics were called in to deal with the unexpected emergency. Veteran Las Vegas actor **Jon Axelrod** was wheeled out on the stage-prop gurney and taken via ambulance to University Medical Center.

'Marriage Can Be Murder' With Oscar Goodman



Producer **John Bentham** confirmed: "In true show-business spirit, the show went on with two more fake 'deaths' as audience members tried to solve the award-winning murder-mystery dinner show. In his absence, Jon was given a standing ovation during his moment at the curtain call."

As of this morning, Jon was being kept at UMC for a few days for tests and observation.

**ROYAL LAUGHS:** Rio headliner magicians **Penn & Teller** had His Royal Highness **Prince Charles** laughing and baffled with their magic show at his fundraising dinner in Windsor Castle on Monday night. The magicians sat at the head table in Waterloo Chamber with Britain's future king and actress **Sarah Jessica Parker,** who also attended.



COURTESY

Rio headliner magicians Penn & Teller with Prince Charles, left, on Monday, June 23, 2014, in London.

"We had a royal dinner of goat cheese, asparagus, artichokes and Beef Wellington but had to forego dessert to prep the 20-minute show," said Teller. They performed their Cups & Balls routine and Teller's needle-eating trick in the Garter Throne Room of the landmark castle.

Penn commented: "It was a great final day in the U.K. for us. We started it by watching the dress rehearsal for the reunion shows of **Monty Python** and ended with dinner and a performance at Windsor Castle for Prince Charles. We are happy to be returning home to Las Vegas this week, but these past two weeks in the U.K. have been fabulous for us."

## QUICK NOTES

Is it true that our Caesars Palace resident headliner **Sir Elton John** is trying to set a record for most countries played to top all of his other achievements? Unfortunately, several countries he recently booked had to be canceled due to war breaking out.

Elton John's *The Million Dollar Piano* at Caesars Palace



Miss Nevada USA Pageant Director **Shanna Moakler** has set the Nov. 21 weekend for the 2015 pageant to be hosted at UNLV by **2011 Miss USA Alyssa Campanella** and newlywed and morning-radio DJ **Chet Buchanan.** The winner takes over from **Nia Sanchez**, who won the 2014 Miss USA Pageant and is prepping for the Miss Universe Pageant.

Actor **Kevin Burke** is returning to the solo show **"Defending the Caveman"** at Harrah's as of July 7 after an engagement in Laughlin. He was the lead for 10 years before turning it over last May to **Chris Allen.** "Caveman" is still the longest-running solo play in Broadway history, and during the run here, Kevin won the Guinness World Record for the most theatrical performances in a 50-day period and performed more than 3,000 shows here.

Rumors persist that as **Pinot Brasserie** ends its 15-year run at the Venetian, a chicken dining concept from Miami will move into the space.

The **Tropic Beauty Model Search** will return to the Strip mid-June next year for its fifth-annual world finals.

**WORLD FOOD CHAMPIONSHIPS:** It's known as the ultimate food fight with more than 500 competitors in nine culinary categories but only one winner. This year with 100 name chefs, the **World Food Championships** returns downtown from Nov. 12-18.

2013 World Food Championships: Finals



VIEW GALLERY

Food TV stars **Ben Vaughan** and **Simon Majumdar** and rising stars **Whitney Miller, Emily Ellen** and **Roberto Trevino** are among the first signed up. Ben, who hosts the WFC events, will present an exclusive chef's table dining experience for competitors. You can get an advance look at all the action and surprises when a one-hour special from last fall airs on A&E's new cable network FYI on July 10.

**SPECIAL SHOW:** Las Vegas cast members from **"Mamma Mia!"** at Tropicana visited **Opportunity Village.** After a tour of the Engelstad campus where they met several of the OVIPs at work, they put on a special surprise performance with "Mamma Mia!" hits "Money, Money, Money," "Mamma Mia" and "Dancing Queen."

**LICENSING CELEBS:** The **Licensing Expo,** the world's largest and most influential annual trade show dedicated to licensing and brand extension, at Mandalay Bay attracted more than 5,000 brands and 15,0000 attendees from 90-plus countries. Attendees included **Jeffrey Katzenberg, Nicole Richie, Priscilla Presley, Kathy Ireland, Tony Hawk, The Bella Twins, Kellie Pickler** and **Grumpy Cat.**

**MURRAY'S MAGIC KIT:** Magician **Murray Sawchuck,** a regular on History Channel's **"Pawn Stars"** as the magic expert, has created a new product, **"The Gold & Silver Pawn Murray Magic Expert Magic Kit."** It has 15 of Murray's favorite magic tricks that are easy to learn from ages 4 years to 104. It goes on sale this week in **Gold & Silver Pawn**'s souvenir section and at Murray's Tropicana show.

**Murray Sawchuck First Anniversary at Tropicana**



VIEW GALLERY

**TONIGHT'S TIPS**

**John Henton, Brian McKim** and **Tracii Skene** headline at the **Improv** at Harrah's through Sunday.

Music maestro **David Perrico** and his 20-piece **Pop Evolution** band are at **Cabaret Jazz** in the **Smith Center.**

It's **Lost Angels** industry night at **Hyde Bellagio.**

**Three Square** food bank hosts a fundraiser with bowling and dancing at **Brooklyn Bowl** in the **Linq.**

**TOMORROW'S TEASE**

Plans for filming the family-feature film **"Guard Dog"** off Strip shift into high gear, plus our coverage of today's **2014 NHL Awards** at Wynn Las Vegas.

*Robin Leach has been a journalist for more than 50 years and has spent the past decade giving readers the inside scoop on Las Vegas, the world's premier platinum playground.*

*Follow **Robin Leach** on Twitter at* [Twitter.com/Robin_Leach](Twitter.com/Robin_Leach)*.*

*Follow **Vegas DeLuxe** on Twitter at* [Twitter.com/vegasdeluxe](Twitter.com/vegasdeluxe)*.*

*Follow Sun A&E Senior Editor **Don Chareunsy** on Twitter at* [Twitter.com/VDLXEditorDon](Twitter.com/VDLXEditorDon)*.*

0 Comments

# Exhibit 2

# TELLER v. GERARD DOGGE

# EXPERT REPORT

# OF

# JIM STEINMEYER

# APRIL 11, 2013

EXPERT WITNESS TESTIMONY

JIM STEINMEYER

My work, since 1981, has been as a magic consultant, designer and concept designer in the field of entertainment. Specifically, I have been a designer of magic effects for professional magicians, a consultant and designer for shows, including Las Vegas shows and Broadway shows. In this capacity, I have worked with most leading magicians, including (but not limited to) Doug Henning (where I worked for him for seven years as his magic designer, for two television specials and two Broadway shows), David Copperfield (I suggested the idea and secret for making the Statue of Liberty disappear, one of the features of his television career), Siegfried and Roy (for their ABC Television special) and Ricky Jay (for two of his off-Broadway shows). I have also been brought into special projects to consult with Criss Angel and David Blaine.

I have invented over one hundred illusions that are currently used, or have been used, by professional magicians. In addition, I have served as a contributing editor to the leading journals in the field, MAGIC Magazine, and as an associate editor and columnist for Genii Magazine.

I've written a number of books about the history and invention of magic. Some of these were technical books for the profession, and some were books for the public, to explain various elements of magic history and art. These books include the Los Angeles Times bestseller, "Hiding the Elephant," "The Last Greatest Magician in the World," and "The Glorious Deception."

I am regularly employed by professional magicians an producers to create special material for their shows. Several years ago, I created the magic for "Ringling Brothers Barnum and Bailey Circus" 139 edition, which was a magic-themed circus.

I have had professional discussions with the Plaintiff, Teller, on a number of occasions involving special projects he was planning, but I have never worked directly for Penn and Teller for consultation on their projects.

Part of my work, and part of my professional career, has involved the history of magic. I am an organizer of the biennial Conference on Magic History in Los Angeles, a conference about historical magic. We have organized twelve of these events since 1989. At this Conference, I've been involved in researching the history of specific magic effects and demonstrating them.

I am regularly called upon to lecture on the history of magic, as well as creativity in magic, as my profession has been, since 1981, to create new ideas for magicians for their performances. These lectures have been given at magicians' organizations, at the TED 8 Conference and the EG Conference in Monterrey, California, and for the U.S. Defense Department in the field of organizing and creating deceptions.

I have been employed as an expert witness in a previous intellectual property case involving a patented special effect as used by magicians and in the theme park industry.

My professional biography is attached, detailing many of my projects in this profession.

I am employed as an expert witness in this case and compensated $350 per hour for my research and testimony.

Analyzing "Shadows" as a Magic Plot

It may be useful to the court to analyze Teller's "Shadows" effect within the industry standards, in order to understand why it is unique, and how it contrasts with other magic effects.

Magic tricks can be described as shorthand "plots" or procedures, in the same way that plays, poems, or novels also have "plots." Historically, magicians have sought to define the possible plots for a magic trick.

Magic authors and theorists have developed several different systems for analyzing magic effects, including the magicians Maskelyne and Devant (in "Our Magic," 1909) and Sam Sharpe (in "Neo Magic," 1932). For my purposes, I will use the classification of Dariel Fitzkee from his book, "The Trick Brain" (1944), as Fitzkee acknowledged the work of Maskelyne, Devant, Sharpe, and other theorists in assembling his own classification of magic.

Fitzkee lists nineteen basic effects for a magic trick. That is, he identifies nineteen basic procedures or "plots" for what a magician can do. These include, "1— Production (Appearance, creation, multiplication). 2—Vanish (Disappearance, obliteration). 3—Transposition—(Change in location). 4—Transformation—(Change in appearance, character or identity)." Fitzkee's list includes versions of something becoming animated or levitating. And he categorizes five separate distinctions of apparent mind reading or mental magic.

As noted by Fitzkee, these plots or effects are often comprised of composite effects. If a red ball disappears and, at the same moment, a yellow bird appears, Fitzkee would not categorize this as an "vanish" and a "production," but as a transformation. (Even though, as Fitzkee notes in his chapters, the trick may be accomplished through the techniques of vanish and production.) The The tenth effect on Fitzkee's list is "Sympathetic Reaction (Sympathetic Response)." Fitzkee defines this as "A reaction of two or more persons, objects or persons and objects, showing sympathetic accord in harmony one with the other." He further notes that the trick demonstrates that "whatever happens to one subject happens also, by apparent sympathetic response to the sympathetic subject."[1]

---

[1] This effect is based on a classical, mythical definition of magic. This is an evocative procedure for a conjurer. We can see in literature of "real magic," witchcraft or spells, that magical powers are often realized in this sympathetic way. For example, a witch could supposedly cause harm to a person by writing

3

Dariel Fitzkee identifies the formula for a Sympathetic effect. It requires, "Two subjects," and "Nature of reaction: a, similar, or b, opposite." In other words, describing the classic Sympathetic Silk Trick, according to Fitzkee's classification, we would say that the two subjects are "three red silk handkerchiefs" and "three green silk handkerchiefs," and the nature of the reaction is, "knotted, in opposite reactions."

Fitzkee notes that a wide variety of secrets or methods may be responsible for this trick. (In the Sympathetic Silk Trick, for example, the trick often involves hiding knots that already exist in handkerchiefs, or introducing fake knots in handkerchiefs, and using false knots or slip knots when tying handkerchiefs.) The secrets are basically immaterial to the overall effect on the audience. A trick might be accomplished by one of a dozen different secret methods, and the audience may not be able to distinguish the differences between secrets. Each will have a slight variation on the presentation, and offer distinct advantages to different performers. For example, a performer adept at sleight of hand may easily utilize the tying of false knots. A performer who is not skillful at sleight of hand may use false mechanical knots, or switch one set of handkerchiefs for another. But in each case, the basic effect remains the same for the audience: handkerchief which were knotted together are no longer knotted together.

---

their name on a piece of paper and then burning that paper. A voodoo priest inflicts pain on a small doll, which is made to represent someone; this supposedly causes a sympathetic reaction in the actual person.

The classical example of sympathetic magic is the Sympathetic Silk Trick. This first became popular at the beginning of the twentieth century, (some time around 1910) when magic with silk scarves became a fashion. (As cited in Rice, 1962.) The Sympathetic Silk Trick is most often presented as a sort of "reverse" sympathetic reaction. Three silk handkerchiefs are shown separate. They are rolled into a ball and placed aside. Three additional handkerchiefs are shown and tied into a chain. The knots disappear from these handkerchiefs. And now the first three handkerchiefs are seen knotted together.

4

In this way, the secret method of the trick (because it is hidden from the audience, and may be selected out of personal preference by the performer) is basically immaterial to the overall effect. It is seen as a means to accomplish the effect.

Using Fitzkee's classification,[2] we would describe Teller's "Shadows" effect in this way: it consists of two objects, namely "a flower, and the shadow of that flower on a paper screen," and nature of the reaction is, "the destruction of the flower, in similar reaction." Hence, we are saying that the flower and the shadow and the flower are working together in sympathy, in an apparent magical way. And the destruction of the rose is the action of the illusion.

## Similar Sympathetic Magic Effects

I turn to magic literature to find any precedents to Teller's "Shadows."

---

[2] As I lecture magicians about the creation of magic effects and creativity, I believe it is useful here to stop and consider the nature of these classifications, as defined by Fitzkee. Nineteen magic effects sounds extremely limiting. It suggests, to an outsider, that there is very little variation in magic tricks.

But it's important to realize that the nature of any classification is to simplify in an effort to understand the possibilities and variations, and classify. Such simplification does not imply a simplicity to the history of magic or the work of magicians.

Similarly, scholarly tomes have suggested seven basic plots in all of literature (or alternately, 36 basic plots). Songs are usually limited to a handful of possible subjects, although the vast majority of songs, throughout history, center on the subject of "love." When we consider that all of these songs have been composed with the same 88 keys on a piano, the process sounds extremely limiting. Yet there is no doubt that distinctive new songs are being written every day.

I'll extend the example. I can broadly classify a song as a "ballad" in the key of "D major" that offers lyrics of "self affirmation and pride in one's individual achievements." This sounds vague and non-specific. It may apply to many songs. With the suggestions that the lyrics focus on the phrase, "My Way," we recognize this as a distinctive popular song that was made famous by the singer Frank Sinatra.

As noted, there are a number of "sympathetic" effects, and this is listed as one of the basic nineteen effects in magic. I am not focusing on all sympathetic magic effects, as many have no similarity to Teller's effect. But if I focus on the earliest effects that utilized a shadow in sympathy with the destruction of an object, I note that an early precedent involved the destruction and death of an animal.[3]

---

[3] The earliest example of this is from the first English published book on magic, Reginald Scot's 1584 The Discoverie of Witchcraft, which mixes a discussion of superstition and witchcraft with an exposure of conjurer's tricks. In the book, Scot explains a trick performed by a "juggler" (a term for a magician) named Brandon in a performance before a king:

"[He] painted on a wall the picture of a dove, and seeing a pigeon sitting on top of a house, said to the king, 'Lo now your Grace shall see what a juggler can do, if he be his craft's master," and then pricked the picture with a knife so hard and so often, and with so effectual words, as the pigeon fell down from the top of the house, stark dead."

Brandon's pigeon trick continued to inspire magicians. In 1770, a British magician named Jonas performed his pigeon trick, described in advertisements as:

"Giving leave to any gentleman to hang a live pigeon on a string, and Mr. Jonas will cut the head off by cutting on the shadow, so that the body shall fall on the ground, and the head shall remain on the string. Mr. Jonas will stand at a distance from the live pigeon, as a surprise to the spectators."

When a similar trick was performed by the Italian magician, Pinetti, a description of the secret appeared in the book, Le Magie Blanc Devoilee, by Decramps. Notice that, by the time of Pinetti's performances, circa 1784, the magician had incorporated a shadow, not a drawing, of the bird:

"The two ribbons... hide a little blade of very sharp steel bent like a sickle, this blade fastgened to a silk cord which, passing between the two ribbons and into one of the columns, goes off to the hands of an assistant. The neck of the pigeon should be fastened by these cords or to a kind of ring of silk so that it can move neither forward nor back. A single light is placed in front of the pigeon in such a way that its shadow will appear on a serviette stretched 12 or 15 inches behind it. If it is full daylight, then it is a pigeon painted on cardboard, which is attached to the serviette... [The magician] first pricks with a sword or a little dagger, the shadow of the pigeon or its picture. The assistant who sees the movement, at this moment cuts the pigeon until the body falls onto the plate...."

By the turn of the twentieth century, sympathetic magic had evolved to match the tastes of modern audiences; there was no blood, no threat of danger or death. The magic involved more innocent situations and more decorative items, such as the Sympathetic Handkerchief Trick, as cited above.

## The Uniqueness of "Shadows"

Although there are a number of sympathetic effects, involving various small props, I find no plot matching Teller's "Shadows." In other words, there is no sympathetic effect involving a flower, and no previous literature of magic involving the willful destruction of the flower.

## The Use of Symbolism in Magic

One of the significant elements of Teller's "Shadows" is the symbol of the flower, the rose.

(Anyone who would see an image of a shadow cast by a rose in a vase in a magic performance, thinks of Teller's trick. Later.)

Magic appeals to legendary or fairy tale images, and the magician's act is enhanced with an appeal to cultural clichés. We see this in the work of the famous Harry Houdini, who surrounded himself with strong symbolism. As author Patrick Culliton has pointed out, Houdini was a small man, and often was photographed to accentuate this, with jail

---

These cruel tricks have long been long eliminated by magicians. (Of course, in this era, the audience would have been familiar with the idea of butchering live birds for food than we are today.) The famous French magician, Robert-Houdin, writing in the mid 1800s, commented unfavorably on these sorts of tricks involving the destruction of small animals.

warders, policemen or other public officials towering over him. This gave the impression of a man in peril, a man challenged by his famous escapes. Similarly, Houdini's most famous feats of magic were strong in symbolism. He walked through a brick wall. He caused an elephant to disappear. In each case, the magic was enhanced with strong symbolism. Walking through a Brick Wall evoked an everyday fantasy for his audience. Bricks were the cliché for buildings, walls, prisons, or cities: the objects that are inviolable. Similarly, Houdini could have walked through steel, or glass, or wood, or ceramic tile. These illusions may have been every bit as mystifying for his audience, but would not have included the powerful symbolism of a brick wall.

Similarly, an elephant is a popular symbol of a large, impractical, slow-moving object. Audience members can imagine standing next to an elephant, and realize the impossible nature of this feat. Similarly, Houdini could have made a horse disappear, or an army of men, or a baseball team. These feats may have been similarly mystifying, but they would not have evoked the symbolism of an elephant.

In popular culture, we see the flower, the rose as a symbol of beauty, of inviolable love, of nature's perfection. It is a symbol in the Christian church as well in Islam; it was associated with Aphrodite (Venus) in ancient mythology. Hence, Teller's "assault" on a rose takes on a special visceral significance to an audience, in a way that attacking some other plant or natural object (a tree branch, a banana) does not. We can see this in Teller's copyright for the scene, in which he portrays himself as the "murderer." Clearly, he always understood the powerful symbolism of the rose, for in attacking a beautiful object, he suggests someone who is performing a dangerous, criminal action.

The Nature of Signature Tricks

There has been a long tradition of "signature" tricks for magicians, the individual specialties that were always associated with that performer, and were included in every show.

8

Of course, the nature of a magic show, like any entertainment, is novelty. So magicians have always been continually changing their routines, including new features to attract return business. So the signature effects, the repeat effects, take on special significance. These represent not only the effects which define the personality of that magician, but the pieces so highly regarded that audiences do not tire of them and, indeed, feel that the performance is not complete unless these effects are included.

This novelty is not to be underestimated in a magic act. Unlike songs, which might be performed by a number of different performers with different styles and in different keys, magic tricks are apparently unique. The fantasy of a magician is that this particular performer is the only person on earth capable of these specific mysteries. Hence, a small group of signature effects have been used to define magicians, and have been important to their success.[4]

---

[4] We see this continually through the history of magic. In the 1880s, to the end of his career, the great American magician, Alexander Herrmann, presented his "Bouquet of Mystic Novelties," the small sleight of hand features that opened his show. Although Herrmann's show changed considerably from season to season, the "Bouquet," sequence was unchanging. Similarly, Herrmann's rival, Harry Kellar, regularly included his blooming rose trick (in which a rose seed, planted in a pot, grew to a full bush and flowered).

Kellar's successor, Howard Thurston, performed as America's leading magician from 1908 to 1936. At every performance, he included his card manipulation routine and his floating lady trick ("The Levitation of Princess Karnac.") Although other magicians performed card routines, none imitated Thurston's sequence. And when one rival, Charles Carter, imitated Thurston's levitation, "Princess Karnac," he was severely criticized by his fellow magicians. Carter did not include the routine in later shows, as it had become so clearly associated with Thurston.

Harry Blackstone, Sr. was very well known for a handful of small effects: The Disappearing Birdcage, Dancing Handkerchief, and a pickpocket routine with the audience. These were included in every performance and, indeed, his versions of these tricks were avoided by his fellow professionals. After his retirement, the Birdcage and Handkerchief routines were sold, exclusively, by Blackstone, through magic dealers. This was a mark of recognition of the importance of these effects, and their association with Blackstone. His son, Harry Blackstone Jr., later included these routines in his own shows.

Teller has been performing "Shadows" since 1975, and has included it in every Penn and Teller show since its creation. Although the duo have developed a number of important and influential routines (including popular features like "Casey at the Bat," and "Needles,") there is no question that "Shadows" has been the longest-used, most prominent, and most commented-upon routine. It is clearly Teller's signature effect and is very closely associated with Teller. In my reviews of Teller's performances throughout his career—over a hundred accounts by various reviewers over more than thirty years—"Shadows" has been featured prominently and had a marked effect upon Teller's audiences.

As is the nature of all such signature effects, it is included in the performance because it is strongly associated with the performer, it distinguishes the performer from other performers or magicians, and it always proves to be a favorite of the audience. In other words, the value of this routine, to Teller, lies in its unique qualities.

For many years, Teller has featured the effect as the penultimate effect in the Penn and Teller shows, which means that it was given a special prominence as the second-to-closing feature. This is a mark of pride and prominence for a professional performer, especially for a "small" or "quiet" piece, such as "Shadows." It means that Teller realizes that audience will want to remember it and discuss it at the end of the performance.

Respect Within the Industry

Professional magicians' signature effects have, in general, been respected within the profession. These effects act as a kind of trademark for the performers. Magicians sought to develop their own versions of routines, or their own particular routines, as the nature of magic has been to make the performances seem unique and special.

We see evidence of this today within the profession. No other professional magician has copied "Shadows," without permission of Teller, as it has become so clearly identified

10

with Teller. This is not a sign that the trick is impossible to achieve. Using a variety of secrets or methods, a modern magician could recreate elements of "Shadows." As an expert in this field, I could make several guesses about how Teller's effect might be achieved. But the effect on the audience has been so clearly associated with Teller, that it is virtually worthless to another magician and would be detrimental to their reputation (to copy Teller) and detrimental to Teller's reputation (to have copies of the effect exhibited in public).

If a version of "Shadows" fell into the hands of a less professional or a more careless performer, its performance would be detrimental to Teller's success. It would cease being special and unique in his show, and would lose its value.

In addition, if a version of "Shadows" was marketed to the magic community, it would impact Tellers opportunity to profit from the sale of this routine, in the future, to other professionals. Note that Harry Blackstone Sr. sold versions of his signature effects (as in footnote 4) after his retirement.

The professional respect for Teller's "Shadows" represents a level of professional courtesy, but it is also a sign that the trick has a strong association with one person. A professional magician who performed a version of "Shadows" would inevitably be compared to Teller, and the copy of the trick would diminish the impact of the original, as it would hint that Teller, a unique performer, did not perform unique material.

Recognition of "Shadows"

It is difficult to overestimate the importance of "Shadows" to Teller's career.

Collected reviews comment on the illusion prominently, and it is often cited as a point-of-departure for Teller; that is, the dramatic and unusual nature of the magic is an example of his different and trendsetting style, differentiating him from other magicians.

11

In my review of pertinent materials,[5] I note particularly, the comments from reviewers that indicate the symbolism and depth suggested by this scenario. In his review, "Fakers and Fakirs," David Bergman described the effect as one of two effects from the Penn and Teller show which "transform magic into an entirely different genre," citing "Shadows" as "a scene that returns magic to its religious origins. In it we encounter not just the mystery of illusion, or the mysteries of the soul, but the mysteries of the cosmos that make shadows." In 1983, the L.A. Weekly cited the routine as something that "transcends trickery, approaching poignancy." The Hollywood Reporter singled out this routine in their review, as "a work of art."

I've also noticed that the magic industry respects and reveres this routine as unique. In one of Teller's first appearances before a group of magicians, at the 1978 Society of American Magicians convention, the routine was reviewed as, "a beautiful, artistic, thing to watch," and concluded that it provided an "artistic finish" to Teller's act.

Defendant's Recognition of Teller's "Shadows"

The defendant's concession that "I've seen the great Penn and Teller performing a similar trick," recognizes that the trick is tied to Penn and Teller's performances. But it's important to keep in mind that, within the industry, there are no "similar" tricks. Before Teller introduced this trick in the 1970s, there was no "similar" trick (in terms of combined plot, effect, and objects), and since Teller's long success with "Shadows," there have been no other "similar" tricks, as the trick has been recognized as original and has not been imitated.

In this way, the defendant's admission that he has seen "a similar trick" must be interpreted that he saw Teller's original trick, and then devised a similar trick in order to capitalize on its success and imitate Teller's famous routine.

---

[5] I reviewed the complaints, pleadings, discovery, court papers, magic literature, and many reviews of Teller's performances from the years of his career, in which "Shadows" was mentioned.

Conclusion

"Shadows" is unique in the magic industry. The idea of using sympathetic magic to combine the image of a flower and its shadow, and to dismantle that flower by apparent magic, evoking images of destruction, murder, and danger, was original with Teller. It was unique and distinctive when it was first introduced in 1975, and has continued to be effective and identifiable for this magician. It has become so strongly associated with Teller, its inventor and performer, that it has taken on the status of a signature piece, representing Teller's brand.

If it were to be sold or otherwise disseminated in the industry, to amateurs or professionals, there is no question that it would have a significant financial consequence for Teller. It would create confusion as it would  automatically be associated with Teller, and most, in the market, would assume that it were his individual effect.

Once sold in this manner, Teller would be unable to profit through the sale of the routine to other performers, should he choose to do this in the future. And the trick would have a severely diminished impact in his own performances; potentially he would be unable to continue to perform it in his shows.

If this unique piece of theatre were not featured by one person, its creator, but became simply part of the standard magician's "bag of tricks" (to use a popular analogy for the range of a magicians' material), it would automatically be less special in Teller's show. It would lose its impact with audiences, it would cease being special, and, by extension, Teller's performances would lose some of their distinction and artistry.

The respect that "Shadows" has engendered from audiences, admirers, and other professional magicians in the industry, would be unfairly diminished.

#

13

Submitted April 11, 2013

Signed,

# EXHIBIT A

**JIM STEINMEYER**
**PROFESSIONAL BIOGRAPHY**

The New York Times calls Jim Steinmeyer the "celebrated invisible man—inventor, designer and creative brain behind many of the great stage magicians of the last quarter-century." His illusions have been seen from Broadway, London's West End, Las Vegas, and in Ringling Brothers and Barnum and Bailey's Greatest Show on Earth. He's the author of best-selling books about magic and magic history, including Hiding the Elephant, and The Glorious Deception. Recognized for his extensive, innovative creations in magic, a recent profile concluded that Jim was "the best living originator of stage illusions," noting his many creations as the "defining illusions in contemporary magic." Jim Steinmeyer has worked with virtually every leading magician around the world, produced magic on television, and written extensively on his illusions as well as his research into the history of magic.

**INVENTING AND DESIGNING ILLUSIONS From 1981 to 1987**

Jim Steinmeyer was the Magic Designer for Doug Henning, who wrote, "I consider Jim the most brilliant mind in magic." Jim invented impossibilities for four Henning television specials, six touring shows, two Henning Broadway shows ("Merlin," for which Jim received his first Drama Desk Nomination, and "Doug Henning's World of Magic"), and numerous television and Las Vegas appearances.

For one of David Copperfield's television specials, Jim proposed an innovative concept, the scenario and secret by which the Statue of Liberty could "disappear." David used the Statue illusion to close his special and created headlines with the mystery.

Jim has also served as a consultant for Siegfried and Roy, David Copperfield and Lance Burton. He developed magic for Orson Welles, Harry Blackstone, and the Pendragons and many, many others. He is a writer and designer of Mark Kalin's "Carnival of Wonders," the critically acclaimed review show.

Jim currently holds four U.S. patents in the field of illusion apparatus, including a new version of the famous "Pepper's Ghost" mystery, which makes it applicable in a variety of

situations, and has also served as an expert witness in this field.

## MAGIC ON STAGE

Jim's special illusions have enhanced many favorite productions on the stage. In 2009, the 139 edition of Ringling Brothers and Barnum and Bailey Circus, "Zing, Zang, Zoom," became a magical circus, featuring large scale illusions specially designed for the show by Jim and presented by magician Alex Ramon. The New York Times called the show "An artful eyeful, liberally spiced with mystifying magic." The illusions include the disappearance of a circus elephant while it was in the center of the arena.

He produced the special, enhanced illusions for the highly praised Las Vegas production of "The Phantom of the Opera," and the critically acclaimed magical effects for the Disney / Cameron Mackintosh stage production of "Mary Poppins," which opened in London and on Broadway. Also in 2009, Jim's magic was featured in the Mark Taper Forum Deaf West co-production of "Pippin," directed by Jeff Calhoun.

Other theatrical productions have included the original Walt Disney Company production of "Beauty and the Beast" on Broadway, where Jim devised the famous climax of the show, when the Beast was levitated into the air and transformed into the Prince. The show followed with eight companies worldwide. He designed the illusions for the 2002 James LaPine production of "Into the Woods," and the following year for "Amour." In October 2003, he produced the eight-foot tall "ghost" of Frank Sinatra for the Radio City Music Hall show, "Sinatra: His Voice, His World, His Way."

He's earned two Drama Desk nominations for his effects, for "Merlin" and "Into the Woods."

Off Broadway, Jim was the effects designer for "Ricky Jay, On the Stem," at the Second Stage Theatre in 2002. Receiving raves for the novel sleight-of-hand routines, ingenious cons and recreations of classical illusions, the show was written and presented by Ricky Jay, and directed by David Mamet. Jim also consulted on the critically acclaimed "Ricky Jay and his 52 Assistants," Ricky's 1994 show.

16

In December of 1998, his illusions were used to recreate H.G. Wells' "The Invisible Man" for the Cleveland Playhouse. The production, directed by Frank Dunlop and starring Jim Dale, set house records and earned raves for the amazing effects. The specially-created illusions included the Invisible Man visibly disappearing in his laboratory, or gradually materializing, from veins, to nervous system to skin, at the end of the story.

In 1998, for Broadway's popular "The Scarlet Pimpernel," Jim added a special effect finale of the hero's seeming execution by guillotine.

In addition, his effects have been used in shows from the Goodman Theatre in Chicago to the Folies Bergere in Las Vegas. In 1996 and '97 he developed the story and illusions for two featured shows for the cruise line Holland America and the illusions for the premiere ship of the Disney Cruise line, the Disney Magic. For Disney and Feld Entertainment, he developed the effects for their worldwide touring show, "Mickey's Magic Show."

## WRITING ON HISTORICAL MAGIC & THEATRICAL EFFECTS

Jim has been recognized for this writing and research on the history and technology of stage magic. His 2003 book, Hiding the Elephant, is a cultural history of magicians, their technology and their backstage battles. The book was a Los Angeles Times bestseller. Publisher's Weekly wrote that Hiding the Elephant was "a find." Author Glen David Gold called the book "simply the finest, best-told, most graceful history of the Golden Age of magic I've ever read... a terrific yarn that will make novelists jealous." Magician Teller, of Penn and Teller, reviewed it in the New York Times and called it "a loving celebration," and concluded, "no author has ever better conveyed magic's joys, terrors and longings." Hiding the Elephant was published by Carroll and Graf in New York.

His 2008 book was a biography of the American writer and compiler of unusual phenomena, Charles Fort. The book, Charles Fort, the Man Who Invented the Supernatural, was published by Tarcher / Penguin.

Jim's book, Jarrett, published by Magic Inc., has become a standard text in this area. Through his research he has discovered the secrets and applications of many lost illusions

from the early years of this century. Other books on the subject include: Antonio Diavolo and The Mystery of Psycho, The Howard Thurston Workbooks, Volumes I and II (a technical account of America's largest magic show, circa 1915), Device and Illusion, and The Magic of Alan Wakeling. Art & Artifice and other Essays on Illusion, was published in December, 1998. It was hailed as a modern classic in the field, an insightful look at historical illusions and their inspirations to magicians. The Science Behind the Ghost, his 1999 book, has been described as the "definitive work" on this history and techniques of the famous Pepper's Ghost illusion. He has served as contributing editor for MAGIC Magazine and Genii Magazine.

Jim is especially proud to be one of the organizers of the Los Angeles Conference on Magic History, which has been hailed for its prestigious and informative programs. For many years, the Conference has featured unique recreations of amazing historical illusions, including effects from Guy Jarrett, David Devant, John Nevil Maskelyne, Professor John Henry Pepper, and Dr. Samuel Cox Hooker.

## PRODUCING AND CONSULTING FOR TELEVISION

Jim produced the 1997 four hour A&E Television Special, "The Story of Magic," the first documentary history of magic, hosted by Ricky Jay. "The Story of Magic" was highly acclaimed by The New York Times and Hollywood Reporter and recognized as a landmark event celebrating the rich history of an art.

Producing the British television series "The Secret Cabaret" for Channel 4, earned Jim a 1990 Royal Television Society Nomination for Light Entertainment programming. Airing for two seasons, twelve episodes, "The Secret Cabaret" offered a new style of variety entertainment and set a new trend in television magic.

He was producer of Fox Family Channel's "Magic on the Edge," a 1999 pilot, and NBC's 1999 Lance Burton Television Special; he also produced the 1996 NBC special, "The Hidden Secrets of Magic," and was co-producer for the of the 1997 ABC television special, "All Star Magic." He also produced or consulted on Ricky Jay's 1989 CBS television special, "Learned Pigs and Fireproof Women," and the 1996 HBO television

production of "Ricky Jay and his 52 Assistants."

In addition to his work for Doug Henning and David Copperfield, Jim was a consultant for many television shows, including ABC's 1994 Siegfried and Roy television special, "The Magic, The Mystery," and Lance Burton's 1996 and 1997 NBC television specials. In 1986 Jim served as technical advisor for the NBC series, "Blacke's Magic," starring Hal Linden as magician Alexander Blacke. (In addition to providing the magic, Jim's hands served as Blacke's for some of the sleight-of-hand work.) Other projects include the 1986 Barbara Mandrell Christmas Special (CBS), the film "Young Harry Houdini," (Disney/ ABC), "Magic at the Magic Kingdom," (NBC), and "The Best of Magic" (Thames Television) "A Night of Magic" (BBC).

## THEME PARK CONCEPT DESIGN

Since 1987, Jim has worked as a Concept Designer and Consultant/Concept Design for Walt Disney Imagineering, the creative development division for the Walt Disney Company's theme parks. In this capacity he is responsible for overall concepts for rides and attractions, as well as show outlines and scripts. Some of his work has been featured in the Toontown attraction for Disneyland, and EPCOT at Walt Disney World in Florida.

He has served as a consultant for special exhibit attractions for a number of companies and venues, such as Chicago's Field Museum, O'Hare Airport, the Los Angeles Museum of Science and Inustry and Hebrew Union College. He has also been involved in the development of live shows and attractions for Walt Disney World Creative Entertainment in Florida and California, for Universal Studios, Jack Morton Productions, Bob Rogers' Imagination Arts, and Speilberg, Katzenberg and Geffen's Dreamworks.

## LECTURES AND AWARDS

Jim has lectured on magic and the creation of theatrical effects for numerous universities, magicians and theatre groups, including The Magic Castle, The Magic Circle in London, F.I.S.M. (the international association of magicians), and in 1998 at the prestigious TED Conference in Monterey, California.

In 2012, he received the David Devant Award, the highest honor from The Magic Circle in Great Britain. In 2009 he received the Special Award for Creativity from FISM, the world association of magic.

In 1991 he was awarded The Creative Fellowship by "The Academy of Magical Arts" (The Magic Castle), recognizing his continuing inventions. The Fellowship awards, created in 1968, are magic's "Oscars," and constitute a lifetime achievement in the art. Jim, at 32, was the youngest person to ever win a fellowship. In 1996 he received the Milbourne Christopher award in recognition of his many inventions for magicians. In 2002, he received the Literary Fellowship Award from "The Academy of Magical Arts."

Jim Steinmeyer was born in 1958 and raised just outside of Chicago, Illinois. He was graduated in 1980 from Loyola University of Chicago, with a major in communications. He currently lives in Los Angeles, California with his wife Frankie Glass, an independent television producer who has worked extensively in Great Britain and the U.S.

#

# EXHIBIT 2

## MATERIAL REVIEWED BY JIM STEINMEYER

| DATE | DOCUMENT/ARTICLE | PUBLICATION |
|---|---|---|
| 12/7/83 | Penn and Teller are perfectly weird and eerie | Los Angeles Herald |
| 12/8/83 | Penn and Teller | Drama-Logue |
| 12/16/83 | No title (Theater New Reviews) | L.A. Weekly |
| 12/21/83 | Stage Reviews Penn and Teller | The Hollywood Reporter |
| 7/23/84 | Penn and Teller pull a good show out of their bag of tricks | Los Angeles Herald |
| 11/22/84 | Humor, wonder are main tricks for this magic duo | Los Angeles Herald |
| 12/7/84 | Penn & Teller: Bad Boys of Magic | L.A. Weekly |
| 4/18/85 | Penn & Teller pack odd bag of tricks with a sinisterly appealing magic show | The Star-Ledger |
| 4/19/85 | Penn & Teller: 1 talks, other just sleightly | Daily News |
| 4/19/85 | The Magical, charm of Penn & Teller | Newsday |
| 4/19/85 | An evening of fine trickery | New York Post |
| 4/29/85 | Review by Brian Bradley | Tomorrow's Television Tonight |
| 5/6/85 | The Theatre Off Broadway | The New Yorker |
| 5/23/85 | Off Broadway Penn and Teller | The Stage (London) |
| 10/20/85 | A Magical Pursuit of Beauty | The Boston Globe |
| 3/86 | The Manic Magic of Penn & Teller | Games |
| 12/26/86 | The Silent Teller Talks | The Times (Good Times) |
| 6/3/87 | Penn & Teller's magic: a Freak Show with Style | The Sun |
| 6/12/87 | Fakers and Fakirs | City Paper (Baltimore) |
| 7/26/87 | The Wizards of Ahhhhhhhhhhhhs | Sunday Press (Atlantic City) |
| 12/2/87 | Penn & Teller: Just a Couple of Carney Guys | New York Newsday |
| 12/2/87 | Magic Made Real | New York Post |
| 12/2/87 | No Abracadabra, but Sheer Magic | The Record |
| 10/20/88 | Duo Works Magic with Odd Entertainment | The Boston Herald |
| 11/21/88 | Penn and Teller all Business with Gullible Audience | San Francisco Examiner |
| 1/24/89 | An Evening of Magic with Penn and Teller | The Inquirer (Philly.com) |
| 1/27/89 | Teller Talks | City Paper (Philadelphia) |
| 2/89 | Penn and Teller at the Wiltern Theatre | |
| 2/7/89 | Penn and Teller at the Shubert Theater | Pulse |
| 3/29/89 | The Macabre Magic of Penn & Teller | Herald Examiner |
| 3/29/89 | Penn, Teller as Magical as Ever | The Daily Breeze |
| 4/1/89 | Carney, class combine for Intriguing Night of Penn & Teller Magic | San Gabriel Valley Tribune |
| 4/6/89 | Penn and Teller Shock Wiltern | Daily Sundial |

| | | |
|---|---|---|
| 5/15/89 | A Couple of Eccentric Guys | The New Yorker |
| 6/7/89 | Penn & Teller, in Animated Suspension | The Washington Post |
| 6/8/89 | Penn & Teller: seriously weird | Potomac News |
| 6/16/89 | Penn and Teller at the National | The Hill Rag |
| 9/26/90 | Duo creates magic, but don't call them magicians | The Flint Journal |
| 10/1/90 | Penn & Teller Present Audiences with the Thinking Man's Magic | Tech Center News |
| 10/17/90 | Penn & Teller Soften Their Blackness – Magic on the Edge | The Toronto Sun |
| 10/31/90 | Penn & Teller Take Pity on the Fooled | Southtown Economist |
| 11/23/90 | Penn and Teller Pop Pretensions of Magic | Star Tribune |
| 11/30/90 | A Night of Magic Turned Upside Down | San Francisco Chronicle |
| 11/30/90 | Penn & Teller Dish up Leftovers on a Moldy "Refrigerator Tour" | Mercury News (San Francisco) |
| 12/20/90 | Magic Becomes a Sitting Duck | Daily News |
| 12/20/90 | Penn & Teller – Running on Empty | Los Angeles Times |
| 12/20/90 | Penn & Teller:  The Refrigerator Tour | LA Weekly |
| 1/24/91 | Penn and Teller at Shubert Theater | The Inquirer |
| 2/13/91 | Duo Pulls Off Tricky Routine | Plain Dealer |
| 2/20/91 | Penn & Teller: on the Funny side of the Fridge | Boston Globe |
| 2/22/91 | Penn & Teller chill out | Boston Phoenix |
| 2/22/91 | Penn and Teller Work Their Own Magic | Parkway Transcript |
| 2/22/91 | Thrills and Chills with Penn and Teller | Journal-Bulletin (Providence, R.I.) |
| 2/26/91 | Tricksters Penn & Teller | The Mass Media |
| 2/27/91 | Comic Magic and Trade Secrets:  Penn and Teller keep things cool on the Refrigerator Tour | Northeastern News |
| 4/4/91 | When Tricks are Treats | Daily News |
| 4/16/91 | Laughing in the Dark – Gory Details | The Village Voice |
| 5/12/91 | Penn & Teller's Refrigerator Tour | The New York Times |
| 6/10/91 | Penn & Teller | Circus Report |
| 8/30/91 | Penn & Teller Magic Show | New York Newsday |
| 11/7/91 | Penn & Teller Rot in Hell | Meridian |
| 11/14/91 | Magic! Humor! Blood & Gore | Columbia Spectator |
| 11/22/91 | Being There or Being Square | |
| Winter, 1991 | Penn & Teller 2 Who Flew the Cuckoo's Nest (missing page?) | Action Track |
| 5/8/92 | Penn & Teller: History and Hype | The Times |
| 12/22/92 | Wicked Tricksters | Palm Beach Post |
| 7/31/93 | Magic's Super Cynics Suit Vogue's Tawdry Show-biz Atmosphere | Vancouver Sun |
| 11/13/93 | Magical Mystery Tour | LA Times |
| 11/14/94 | Penn & Teller surprise, delight | Rockford Register Star |
| 1/30/95 | Penn and Teller Make Magic with Acts and Wit | Orange County Register |

| | | |
|---|---|---|
| 6/9/95 | Penn & Teller's Witty, Dark Magic is Wondrous Fun | Las Vegas Review-Journal |
| 11/30/95 | For Penn & Teller, the Trick is in the Telling (missing page?) | Orange County Register |
| 3/23/96 | The Academy of Magical Arts 28th Annual Awards | |
| 4/26/96 | A Little Stock of Magical Horrors | The Times of London |
| 5/27/96 | Blood Brothers | |
| 2/5/98 | True Lies – the Abrasive Art of Penn and Teller | |
| 2/12/99 | Duo Not Taking Magic Too Seriously | Las Vegas Review Journal |
| 3/23/99 | Penn and Teller, Annie continue March Theater Offerings | |
| May/June 2000 | Penn and Teller the Incredible Thinking Men | Chance |
| 6/9/2000 | The Wonder Boys | New York Post |
| 1/25/01 | Penn & Teller Do Their Usual | |
| 10/02 | Penn & Teller Vision | What's On |
| 3/30/05 | Penn & Teller 30 Years on the Cutting Edge | The Hollywood Reporter |
| 3/30/05 | Vegas, Baby, Vegas | The Hollywood Reporter |
| 2004 | Penn & Teller's Top 10 Things One Should Never Do in a Vegas Magic Show | Frommer's |
| 9/12/04 | Decidedly Different | Showbiz Weekly |
| 9/26/04 | Pair of Jokers | Showbiz Weekly |
| 2/15/05 | Magic & Mayhem | What's On |
| 5/8/05 | Behind the Curtain | Showbiz Weekly |
| 8/30/05 | Two is the Luckiest Number | What's On |
| 6/4/06 | Supremely Confident | Showbiz Weekly |
| 12/30/07 | Magic's Skeptical Sons | Showbiz Weekly |
| 2009 | On a Long-Term Roll in Vegas | The Philadelphia Inquirer |
| 6/21/09 | Teller Talks | Los Angeles Times |
| 2010 | Tricks of the Trade | Las Vegas Review Journal |
| 2/10 | Penn & Teller (in German) | Magie |
| 6/14/10 | Penn & Teller put on a Magical Show for Vancouver | Straight.com |
| 7/9/10 | Penn and Teller Interview | Telegraph (London) |
| 7/15/10 | Magical Sound of Jaws Hitting the Floor | Evening Standard |
| 11/3/10 | No Bullshit for Penn & Teller | Atlantic City Weekly |
| 7/3/11 | Bet on this Pair | Las Vegas Magazine |
| 2/3/12 | Las Vegas Review: The Penn & Teller | The Jim Jesus Blog |
| Undated | Penn & Teller Start the Millennium | |
| Undated | Penn & Teller at the Wilshire Theatre | Backstage.com |
| Undated | Reserved | |

| Undated | Lost the Fridge – Kept their Cool | C.W. Post |
|---|---|---|
| Undated | Penn and Teller bring Magic Back to Broadway | |
| Undated | Penn and Teller are Baffling, Bloody and Brillant | |
| Undated | Masters of Misdirection | Las Vegas Magazine |
| Undated | Duo Cut from Different Cloth | |
| Undated | Illusionists Penn & Teller age like a fine wine | Las Vegas Review Journal |
| Undated | Penn & Teller's Tricks are a Treat | Times |
| Undated | Unfurling a Banner Act | |
| Undated | A Few Words with Teller | |
| Undated | The Magic of Penn & Teller: edgy, ironic and fun | Seattle Times |
| Undated | From Penn & Teller; Tricks & Tweaks | Washington Post |
| Undated | Asparagus Valley Cultural Society | |
| | Transcription of Penn & Teller Bravo Profile | |
| 1/11/13 | Plaintiff's First Set of Request for Admissions to Defendant Dogge | |
| 2/8/13 | Answer to Plaintiff's First Set of Requests for Admissions & Defendant First Set of Requests for Admissions to Plaintiff Teller | |
| 2/27/13 | Plaintiff's Second Set of Requests for Admissions to Defendant Dogge | |
| 3/13/13 | Plaintiff's Responses to Defendant's First Set of Requests for Admissions | |
| 3/28/13 | Answers to Plaintiff's Second Set of Interrogatories and Defendant Second Set of Interrogatories to Plaintiff Teller | |
| 3/28/13 | Answer to Plaintiff's Second set of Requests for Production of Documents and Defendant's Second Set of Requests to Plaintiff for Production of Documents | |
| 3/28/13 | Answer to Plaintiff's Second Set of Requests for Admissions and Defendant Second Set of Requests for Admissions to Plaintiff | |
| 4/25/12-3/6/13 | Pleadings filed in Teller v. Gerard Dogge, United States District Court, District of Nevada, case no. 2:12-cv-00591-JCM-GWF | |
| | Documents produced by Defendant Dogge and attached to Initial Disclosures (no bates numbers) | |
| | Documents produced by Plaintiff Teller (TELLER000001-TELLER00072) | |
| 9/78 | MUM (The Journal of the Society of American Magicians) | |
| Undated | A Rich Cabinet of Magical Curiosities, Edwin Dawes | |

| | | |
|---|---|---|
| 1983 | Clarke, Sidney<br>The Annals of Conjuring<br>Magico Magazine, New York City | |
| 1944 | Fitzkee, Dariel<br>The Trick Brain<br>San Rafael House, San Rafael, CA | |
| 2011 | Steinmeyer, Jim<br>The Last Greatest Magician in the World<br>Jeremy Tarcher, Penguin, New York City | |
| 2005 | Steinmeyer, Jim<br>The Glorious Deception,<br>Carroll and Graf, New York City | |
| 1962 | Rice, Harold,<br>The Encyclopedia of Silk Magic<br>Silk King Studios, Ardmore, Pennsylvania | |

# Exhibit 3

```
 1            UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEVADA

 3

 4   TELLER, an individual,        )
                                   )
 5              Plaintiff,         )
                                   )
 6   vs.                           ) Case No.:
                                   ) 2:12-cv-00891-JCM-GWF
 7   GERARD DOGGE (P/K/A GERARD    )
     BAKARDY), an individual,      )
 8                                 )
                Defendant.         )
 9   _____)

10

11

12

13        VIDEOTAPED/TELEPHONIC DEPOSITION OF

14                 GERARD DOGGE

15               ANTWERP, BELGIUM

16                 JUNE 11, 2013

17

18

19

20

21

22

23

24

25   REPORTED BY: BRENDA MATZOV, CA CSR NO. 9243
```

| | | |
|---|---|---|
| 10:21:44 | 1 | band.  We were all freelance musicians working together |
| 10:21:48 | 2 | in the band. |
| 10:21:49 | 3 | Q.   Okay.  Can you tell me when you first had |
| 10:21:55 | 4 | a act that was your act that you performed as a solo |
| 10:22:04 | 5 | artist? |
| 10:22:08 | 6 | A.   I -- Mr. Tratos, excuse me for interrupting |
| 10:22:11 | 7 | your question now.  But I think you are mistaken now, |
| 10:22:15 | 8 | taking Antwerp for Las Vegas.  In -- in Belgium, Antwerp |
| 10:22:19 | 9 | it's not like Las Vegas, and we don't have big acts on |
| 10:22:23 | 10 | stages and in theaters.  And many musicians and singers |
| 10:22:27 | 11 | are just working freelance all over the country in small |
| 10:22:30 | 12 | bars and small restaurants. |
| 10:22:30 | 13 | So I'm not proud to say that I had an act |
| 10:22:34 | 14 | because I never had an act, as you can say.  People |
| 10:22:37 | 15 | would recognize me as, wow, here is Gerard D'Anvers |
| 10:22:42 | 16 | or Gerard Bakardy.  I was always low profile, working |
| 10:22:45 | 17 | in small restaurants and small cafes. |
| 10:22:48 | 18 | Q.   I appreciate that, sir.  The -- the question, |
| 10:22:50 | 19 | though, is:  There -- there was a time that you were |
| 10:22:53 | 20 | booked by a cafe or a restaurant and they hired you |
| 10:23:00 | 21 | to come perform. |
| 10:23:01 | 22 | Would you essentially be there with other |
| 10:23:07 | 23 | musicians and other performers?  Or were you the sole |
| 10:23:10 | 24 | performer performing in those cafes or restaurants? |
| 10:23:14 | 25 | A.   I was the solo performer. |

| | | |
|---|---|---|
| 10:23:17 | 1 | Q.   All right.  So when did you first become |
| 10:23:19 | 2 | a solo performer doing that kind of work in Antwerp? |
| 10:23:24 | 3 | A.   As I said before, Mr. Tratos, I started at |
| 10:23:26 | 4 | the age of 18 being a solo entertainer. |
| 10:23:31 | 5 | Q.   Okay.  So from 18 on, you have made your |
| 10:23:36 | 6 | living essentially as a performer? |
| 10:23:41 | 7 | A.   Not only as a -- as a performer.  In Belgium, |
| 10:23:44 | 8 | performers, singers, musicians, they have a hard job |
| 10:23:52 | 9 | to make a living of -- of their profession.  So most |
| 10:23:56 | 10 | of them, even the most famous artists in Belgium, they |
| 10:23:59 | 11 | have two or three professions.  And so did I. |
| 10:24:06 | 12 | Q.   All right.  Let's -- let's talk about the |
| 10:24:08 | 13 | other professions that you had besides being a |
| 10:24:11 | 14 | performer.  What were they? |
| 10:24:12 | 15 | A.   I was a -- |
| 10:24:13 | 16 | (Comment in Dutch by the witness.) |
| 10:24:16 | 17 | THE WITNESS:  "Salesman"? |
| 10:24:17 | 18 | THE INTERPRETER:  "Salesman." |
| 10:24:19 | 19 | THE WITNESS:  -- salesman. |
| 10:24:21 | 20 | Q.   BY MR. TRATOS:  And what were you selling, |
| 10:24:22 | 21 | sir? |
| 10:24:23 | 22 | A.   All kind of products, Mr. Tratos, where |
| 10:24:26 | 23 | I could money -- |
| 10:24:28 | 24 | (Brief exchange in Dutch between the |
| 10:24:28 | 25 | interpreter and the witness.) |

| | | |
|---|---|---|
| 10:31:57 | 1 | times. |
| 10:31:58 | 2 | Q. Okay. Do you recall whether the songs that |
| 10:32:02 | 3 | were -- were broadcast, were they songs that you wrote, |
| 10:32:07 | 4 | or were they songs that someone else wrote? |
| 10:32:11 | 5 | A. Never in my life I was able to write a song. |
| 10:32:18 | 6 | So this was a cover, like we call it here. |
| 10:32:21 | 7 | Q. Right. Well, and it's called a cover in the |
| 10:32:23 | 8 | United States too. |
| 10:32:24 | 9 | So your recordings that you recorded were all |
| 10:32:27 | 10 | cover songs? |
| 10:32:30 | 11 | A. Yes. |
| 10:32:32 | 12 | Q. Okay. Calling your attention now to anything |
| 10:32:37 | 13 | besides being a musician, when you were an entertainer, |
| 10:32:42 | 14 | besides being someone who plays the keyboard, what other |
| 10:32:50 | 15 | elements did you do to entertain people? |
| 10:32:53 | 16 | Did -- did you tell jokes, for example? |
| 10:32:56 | 17 | A. Yes, I did. |
| 10:32:57 | 18 | Q. When did you first add joke telling to your |
| 10:33:01 | 19 | repertoire? |
| 10:33:03 | 20 | A. I don't remember, Mr. Tratos. Probably when |
| 10:33:06 | 21 | I was -- when I was 14 or so or 12. I don't remember. |
| 10:33:10 | 22 | Q. Okay. So that's always been part of your |
| 10:33:13 | 23 | performance? |
| 10:33:14 | 24 | A. Yes. |
| 10:33:16 | 25 | Q. Okay. Do you recall when you first did a |

| | | |
|---|---|---|
| 10:33:20 | 1 | magic trick as part of your performance? |
| 10:33:31 | 2 | A.   Maybe 12 years ago. |
| 10:33:37 | 3 | Q.   Do you recall where you were performing at |
| 10:33:39 | 4 | the time that you did your first magic trick? |
| 10:33:43 | 5 | A.   In a -- in a bar, a music bar in Antwerp. |
| 10:33:51 | 6 | Q.   Can you tell me how you first decided to add |
| 10:33:55 | 7 | a magic trick to your performance? |
| 10:33:58 | 8 | A.   Can -- sorry.  Can you repeat your question? |
| 10:34:04 | 9 | Q.   Sure.  How did you decide to add a magic trick |
| 10:34:09 | 10 | to your musical performance? |
| 10:34:11 | 11 | A.   "How did you decide?" |
| 10:34:14 | 12 | Q.   Yeah.  Tell me what -- what caused you to add |
| 10:34:18 | 13 | a -- a magic trick to your otherwise performance.  You |
| 10:34:23 | 14 | had been performing since you were 18 or so.  And then |
| 10:34:28 | 15 | 12 years ago, you added magic to it. |
| 10:34:30 | 16 | What caused you to add magic to it? |
| 10:34:34 | 17 | A.   Because I met a magician in one of these bars |
| 10:34:41 | 18 | where I was working.  And I get quite excited seeing |
| 10:34:45 | 19 | magic tricks.  And there my interest for magic start |
| 10:34:50 | 20 | to grow.  And I could see that the magician was |
| 10:34:53 | 21 | entertaining the guests in the bar. |
| 10:34:55 | 22 | And I thought about myself:  Wow, this |
| 10:34:59 | 23 | could be a nice combination, magic and music together, |
| 10:35:03 | 24 | especially when the crisis was knocking on the door |
| 10:35:08 | 25 | and that musicians were not so busy and always searching |

| | | |
|---|---|---|
| 10:35:14 | 1 | for a job.  And I thought this was -- could be a nice |
| 10:35:17 | 2 | thing to add to my performance, which was in that time |
| 10:35:23 | 3 | only music.  And now I thought I could -- maybe I could |
| 10:35:27 | 4 | have more success by adding magic to my performance. |
| 10:35:32 | 5 | Is this clear, Mr. Tratos? |
| 10:35:34 | 6 | Q.   Is it clear.  Thank you very much.  That's |
| 10:35:36 | 7 | very helpful. |
| 10:35:37 | 8 | You said when the -- "when the crisis." |
| 10:35:39 | 9 | What -- what crisis are you referring to? |
| 10:35:45 | 10 | A.   I don't -- the crisis -- I think you're aware |
| 10:35:49 | 11 | we are in a crisis now.  So this crisis in the music, |
| 10:35:53 | 12 | artists -- artistic world started maybe a bit earlier |
| 10:35:59 | 13 | than we have this bank crisis now. |
| 10:36:02 | 14 | Because, in Europe, we call it the East Block |
| 10:36:07 | 15 | countries and these people they are always looking for |
| 10:36:09 | 16 | a job and they always want to work cheaper than other |
| 10:36:14 | 17 | people, like in England or like in Belgium, in Holland. |
| 10:36:14 | 18 | And we say they go under the price.  And then the |
| 10:36:19 | 19 | competition grows and grows.  And then the musicians |
| 10:36:23 | 20 | in Belgium, in England -- and not only the musicians, |
| 10:36:27 | 21 | the plumber and the brick layer, everyone has to fight |
| 10:36:31 | 22 | this competition.  And then we have to be inventive. |
| 10:36:35 | 23 | And my way of being inventive was not going |
| 10:36:38 | 24 | under the price but adding something to my music, which |
| 10:36:42 | 25 | was magic in that case, Mr. Tratos. |

| | | |
|---|---|---|
| 10:42:39 | 1 | you got excited about seeing the magic. |
| 10:42:42 | 2 | What was the name of that magician? |
| 10:42:43 | 3 | A.   Gill Ricardo. |
| 10:42:48 | 4 | Q.   Could you spell the last name, please? |
| 10:42:50 | 5 | A.   R-i-c-a-r-d-o.   Ricardo. |
| 10:43:00 | 6 | Q.   Is Mr. Ricardo a friend of yours? |
| 10:43:04 | 7 | A.   Yes, he is.   He -- we -- we became friends. |
| 10:43:10 | 8 | Q.   Do you talk to him regularly? |
| 10:43:14 | 9 | A.   Yes. |
| 10:43:16 | 10 | Q.   Okay.   Where does Mr. Ricardo live? |
| 10:43:20 | 11 | A.   He lives in Antwerp. |
| 10:43:24 | 12 | Q.   Does he perform in Antwerp? |
| 10:43:26 | 13 | A.   Yes.   I think so. |
| 10:43:28 | 14 | Q.   Okay.   Can you tell me, please, what was the |
| 10:43:33 | 15 | first magic trick that you performed as part of your |
| 10:43:40 | 16 | act? |
| 10:43:42 | 17 | A.   It was a vanishing silk. |
| 10:43:49 | 18 | Q.   And where did you acquire the prop for your |
| 10:43:54 | 19 | vanishing silk illusion? |
| 10:43:57 | 20 | A.   Do you mean where did I buy it? |
| 10:43:59 | 21 | Q.   That's correct. |
| 10:44:01 | 22 | A.   In a magic store somewhere in Belgium.  I |
| 10:44:04 | 23 | believe in -- in a town Kortrijk. |
| 10:44:07 | 24 | Q.   Okay.   When you first performed magic as part |
| 10:44:11 | 25 | of your act or performance, how many magic tricks did |

| | | |
|---|---|---|
| 10:44:18 | 1 | you perform? |
| 10:44:21 | 2 | A.   It was limited to the vanishing silk and a |
| 10:44:24 | 3 | few card tricks, no more. |
| 10:44:28 | 4 | Q.   How long did it take you to learn and practice |
| 10:44:33 | 5 | the vanishing silk trick before you first publicly |
| 10:44:38 | 6 | performed it as part of your act? |
| 10:44:40 | 7 | A.   Four minutes. |
| 10:44:43 | 8 | Q.   You learned it in four minutes? |
| 10:44:45 | 9 | A.   Yeah. |
| 10:44:47 | 10 | Q.   How many card tricks did you perform as part |
| 10:44:50 | 11 | of your act initially? |
| 10:44:53 | 12 | A.   I don't remember, Mr. Tratos. |
| 10:44:54 | 13 | Q.   Okay.   Can you tell me, please, what was the |
| 10:45:00 | 14 | next illusion or magic trick that you added to your act? |
| 10:45:10 | 15 | A.   There was no other illusion or magic trick |
| 10:45:14 | 16 | added to my act. |
| 10:45:16 | 17 | Q.   So you performed a vanishing silk, and you |
| 10:45:19 | 18 | performed some card tricks? |
| 10:45:22 | 19 | A.   Exactly, sir. |
| 10:45:23 | 20 | Q.   That is all that you did 12 years ago? |
| 10:45:26 | 21 | A.   Yes, sir. |
| 10:45:27 | 22 | Q.   Okay.   Can you tell me which card tricks |
| 10:45:32 | 23 | you performed? |
| 10:45:34 | 24 | A.   No.   Simple.   Because I'm not a great |
| 10:45:40 | 25 | magician, they were all simple, easy card tricks. |

| | | |
|---|---|---|
| 10:45:44 | 1 | Q.  Okay.  Can you tell me:  Do you still do |
| 10:45:49 | 2 | those card tricks in your act today? |
| 10:45:55 | 3 | A.  Not really.  Maybe I must clear up a |
| 10:46:02 | 4 | misunderstanding.  The main act is music.  And when |
| 10:46:06 | 5 | I perform magic, it's not really on stage or it's |
| 10:46:09 | 6 | not really a act.  It's -- it's -- we call this table |
| 10:46:15 | 7 | hopping, close-up table hopping. |
| 10:46:19 | 8 | Q.  I -- I understand. |
| 10:46:23 | 9 | So you're suggesting that you don't use magic |
| 10:46:28 | 10 | in your act per se? |
| 10:46:31 | 11 | A.  It depends what you understand by "act," |
| 10:46:34 | 12 | Mr. Tratos. |
| 10:46:35 | 13 | Q.  Well, it's when you're -- you're -- you're |
| 10:46:37 | 14 | announced.  You take your position in the cafe.  You |
| 10:46:43 | 15 | are starting to perform.  During that performance, |
| 10:46:47 | 16 | before you take a break, you're singing songs.  You're |
| 10:46:52 | 17 | playing the keyboard. |
| 10:46:53 | 18 | At any time during that period of time while |
| 10:46:55 | 19 | you're performing, do you do a magic trick? |
| 10:46:58 | 20 | A.  No.  I do a magic trick when I take a break |
| 10:47:01 | 21 | and when I say "hello" to the people in the restaurant |
| 10:47:04 | 22 | or in the bar and:  Do you want to see a nice trick? |
| 10:47:05 | 23 | Come on, let's see it on the table here.  But not on |
| 10:47:08 | 24 | stage.  And it -- sometimes it doesn't happen at all. |
| 10:47:10 | 25 | Or most of the times, it doesn't happen at all.  And |

| | | |
|---|---|---|
| 11:13:06 | 1 | Tape 2 in the deposition of Gerard Dogge.  Going back |
| 11:13:10 | 2 | on the record at 11:13 a.m. |
| 11:13:13 | 3 | MR. TRATOS:  Thank you. |
| 11:13:16 | 4 | Q.  BY MR. TRATOS:  Mr. Dogge, we are back on the |
| 11:13:18 | 5 | record.  I remind you you're still under oath. |
| 11:13:22 | 6 | And I would call your attention to your prior |
| 11:13:25 | 7 | testimony that you recalled seeing Teller perform his |
| 11:13:31 | 8 | Shadows illusion when you saw the video on YouTube. |
| 11:13:39 | 9 | And I asked you specifically what occasioned that. |
| 11:13:46 | 10 | And you made reference to the convention that you |
| 11:13:48 | 11 | attended in England in either 2007 or 2008. |
| 11:13:56 | 12 | What was it about that convention in 2007 or |
| 11:13:59 | 13 | 2008 that caused you to look for his video on YouTube? |
| 11:14:08 | 14 | A.  Nothing on this convention caused me to look |
| 11:14:12 | 15 | for his video on YouTube.  But on one of these dusty |
| 11:14:18 | 16 | stands, there were a few boxes on one of these shelves |
| 11:14:25 | 17 | showing a rose.  And I saw this.  I noticed this.  And |
| 11:14:29 | 18 | I asked the -- the salesman -- |
| 11:14:32 | 19 | Do I say it right? |
| 11:14:33 | 20 | THE INTERPRETER:  (Interpreter nods head in |
| 11:14:33 | 21 | the affirmative.) |
| 11:14:34 | 22 | THE WITNESS:  -- the salesman to explain me |
| 11:14:36 | 23 | what this was.  Because, of course, I was searching |
| 11:14:39 | 24 | to find a trick on this convention where a rose or |
| 11:14:43 | 25 | a flower could be -- be manipulated or could be used. |

| 11:14:49 | 1 | And the man explained me about this trick. |
| 11:14:52 | 2 | And this was a rose what [sic] falls apart on the |
| 11:14:58 | 3 | magician's command.  And, of course, he didn't want |
| 11:15:02 | 4 | to show how the trick works.  I had to buy the trick. |
| 11:15:05 | 5 | But he explained me:  If you do some research on the |
| 11:15:09 | 6 | Internet, you will find this trick.  And that's what |
| 11:15:11 | 7 | I did a few days after when I came home. |
| 11:15:15 | 8 | Q.   BY MR. TRATOS:  Do you still have -- did you |
| 11:15:18 | 9 | buy that -- that trick when you were there? |
| 11:15:20 | 10 | A.   Sorry? |
| 11:15:22 | 11 | Q.   Did you buy the box that -- |
| 11:15:24 | 12 | A.   No. |
| 11:15:24 | 13 | Q.   -- that trick was in when you were there in |
| 11:15:27 | 14 | the convention? |
| 11:15:28 | 15 | A.   Unfortunately, I didn't buy it.  And I wanted |
| 11:15:33 | 16 | to buy it the next day, but it was sold out. |
| 11:15:37 | 17 | Q.   Okay.  Do you recall anything on what the |
| 11:15:44 | 18 | packaging said on the box? |
| 11:15:47 | 19 | A.   It was just a picture.  It was a white box |
| 11:15:51 | 20 | with a picture of a rose in -- in full color, red leaves |
| 11:15:55 | 21 | and -- what is this there? -- and green, just a rose. |
| 11:16:03 | 22 | Q.   Okay.  And have you ever seen another such |
| 11:16:06 | 23 | box since the time you saw it at the convention? |
| 11:16:13 | 24 | A.   No. |
| 11:16:14 | 25 | Q.   Have you ever looked for it to buy one on the |

| | | |
|---|---|---|
| 11:27:40 | 1 | rephrase the question. |
| 11:27:42 | 2 | Is the illusion, as you understand it, that |
| 11:27:45 | 3 | you could dismantle the rose itself by dismantling |
| 11:27:53 | 4 | its shadow, by cutting its shadow? |
| 11:27:55 | 5 | Is that the illusion? |
| 11:27:58 | 6 | A.   I think so.  Yes.  I don't -- I don't -- |
| 11:28:01 | 7 | Q.   All right. |
| 11:28:02 | 8 | A.   I don't understand the question. |
| 11:28:04 | 9 | Q.   All right. |
| 11:28:04 | 10 | A.   If you -- |
| 11:28:04 | 11 | Q.   Well, I think you've just answered it.  So -- |
| 11:28:06 | 12 | A.   Maybe I ask the inter -- |
| 11:28:07 | 13 | Q.   Let me -- |
| 11:28:07 | 14 | A.   -- interpreter to help me. |
| 11:28:08 | 15 | Q.   -- move to the next question. |
| 11:28:11 | 16 | How many times did you watch Mr. Teller's |
| 11:28:18 | 17 | video before you decided to build your own rose prop? |
| 11:28:26 | 18 | A.   As I told you before, Mr. Tratos, I don't |
| 11:28:28 | 19 | remember.  Maybe two or three times. |
| 11:28:30 | 20 | Q.   Okay.  Specifically when did you first decide |
| 11:28:38 | 21 | to build your own rose prop? |
| 11:28:48 | 22 | A.   It was in the time when I visited this |
| 11:28:51 | 23 | convention in Blackpool.  So 2007, 2008, five, six |
| 11:28:57 | 24 | years ago. |
| 11:28:59 | 25 | Q.   Did you begin working on the construction |

| 11:41:08 | 1 | A. I don't remember, Mr. Tratos. |
| 11:41:11 | 2 | Q. Can you give me a rough estimate, please? |
| 11:41:15 | 3 | A. No, Mr. Tratos. |
| 11:41:18 | 4 | Q. Okay. When did you first decide to make |
| 11:41:27 | 5 | a video of you performing the illusion The Rose and |
| 11:41:36 | 6 | Her Shadow? |
| 11:41:41 | 7 | A. From the moment I was sure that my prop was |
| 11:41:44 | 8 | working properly and that it was a reliable prop, from |
| 11:41:53 | 9 | that moment, I decided to video record it. |
| 11:41:58 | 10 | Q. Okay. When you decided to video record it, |
| 11:42:02 | 11 | did you have a video camera yourself? |
| 11:42:06 | 12 | A. I had a video recorder myself, but -- I still |
| 11:42:10 | 13 | have this video recorder. It's a -- a lousy, cheap, bad |
| 11:42:14 | 14 | one. So I asked a friend of mine if I could borrow his |
| 11:42:19 | 15 | more expensive high-definition camera. |
| 11:42:22 | 16 | Q. Who is the friend you borrowed it from? |
| 11:42:25 | 17 | A. You mean -- you want to know the name of my |
| 11:42:29 | 18 | friend? |
| 11:42:29 | 19 | Q. Yeah. The name of the individual you borrowed |
| 11:42:31 | 20 | the camera from. |
| 11:42:33 | 21 | A. It's not relevant, sir. |
| 11:42:35 | 22 | Q. It is relevant, and it's discoverable. |
| 11:42:37 | 23 | You are talking about borrowing someone else's camera. |
| 11:42:44 | 24 | That camera was used to record the illusion which we |
| 11:42:48 | 25 | believe is an infringement. Therefore, his name is |

| | | |
|---|---|---|
| 11:45:57 | 1 | things from each other.  And I was very proud to show |
| 11:46:01 | 2 | my invention with the magic community, with the world, |
| 11:46:05 | 3 | with all the YouTube visitors, with everyone. |
| 11:46:11 | 4 | Q.   Did your posting of the videos include an |
| 11:46:14 | 5 | offer to sell people the illusion with a manual on how |
| 11:46:21 | 6 | to perform the illusion? |
| 11:46:26 | 7 | A.   As I remember, the videos did end with a |
| 11:46:31 | 8 | few words on the screen.  And this -- the words were: |
| 11:46:36 | 9 | "Now available, the better than in Las Vegas |
| 11:46:40 | 10 | trick." |
| 11:46:40 | 11 | Or something like that. |
| 11:46:44 | 12 | Q.   Why did you use the words "better than in |
| 11:46:48 | 13 | Las Vegas"? |
| 11:46:48 | 14 | A.   Because it was. |
| 11:46:50 | 15 | Q.   What were you referring to by referring to |
| 11:46:52 | 16 | "Las Vegas"? |
| 11:46:56 | 17 | A.   Mr. Teller.  Mr. Penn & Teller shows.  [sic] |
| 11:47:01 | 18 | Q.   So you intended people to recognize this as |
| 11:47:04 | 19 | being the same illusion that Teller performed? |
| 11:47:09 | 20 | A.   No, Mr. Tratos.  Because it isn't the same |
| 11:47:12 | 21 | illusion. |
| 11:47:13 | 22 | Q.   Did you -- let me ask you a series of |
| 11:47:18 | 23 | questions. |
| 11:47:18 | 24 | When you posted the video, did you first have |
| 11:47:23 | 25 | the image of the rose and its shadow appearing first by |

| | | |
|---|---|---|
| 12:52:07 | 1 | Tratos?  I didn't understand you so well. |
| 12:52:12 | 2 | Q.   Sure.  Do you know what the average price |
| 12:52:16 | 3 | that is paid to a prop builder is for a -- an illusion |
| 12:52:23 | 4 | prop? |
| 12:52:25 | 5 | A.   No, Mr. Tratos.  I don't know how much |
| 12:52:28 | 6 | illusion builders or prop builders get paid.  The |
| 12:52:31 | 7 | only prices I'm aware of is what I can find on the |
| 12:52:35 | 8 | Internet on what price they were -- are sold on the |
| 12:52:38 | 9 | Internet. |
| 12:52:39 | 10 | Q.   Okay.  Specifically in your advertisement, |
| 12:52:44 | 11 | is there a price associated with it?  This is Exhibit 3. |
| 12:52:49 | 12 | Is there a price you've set on it? |
| 12:52:51 | 13 | A.   What -- I -- I don't understand your question. |
| 12:52:58 | 14 | You -- you mean if there is a price mentioned |
| 12:53:00 | 15 | on the document? |
| 12:53:02 | 16 | Q.   That's correct. |
| 12:53:03 | 17 | A.   Yes.  There are two prices mentioned on the |
| 12:53:06 | 18 | document. |
| 12:53:08 | 19 | Q.   What is the price for the prop that you built? |
| 12:53:17 | 20 | A.   I don't sell my prop at the moment.  So there |
| 12:53:19 | 21 | is no price for the prop. |
| 12:53:22 | 22 | Q.   What is the price that you listed on this |
| 12:53:23 | 23 | document? |
| 12:53:25 | 24 | A.   The price listed on this document speaks |
| 12:53:27 | 25 | for himself.  It's 2,450 or 2,299. |

| | | |
|---|---|---|
| 12:53:31 | 1 | Q.  2,450 is the euros, the number of euros? |
| 12:53:36 | 2 | A.  Yes, sir. |
| 12:53:38 | 3 | Q.  Okay.  And the two -- 2,299 euros, is that |
| 12:53:46 | 4 | for the rose and the vase? |
| 12:53:54 | 5 | A.  Yes, sir, that is.  Yes. |
| 12:53:56 | 6 | Q.  How did you come up with that price? |
| 12:54:00 | 7 | A.  Because I compared this trick with other |
| 12:54:05 | 8 | tricks sold on the Internet.  And I could see that -- |
| 12:54:08 | 9 | for instance, I can give you an example.  There is |
| 12:54:12 | 10 | a trick or illusion with a dancing handkerchief -- |
| 12:54:19 | 11 | Do you say it like that?  "Handkerchief"? |
| 12:54:21 | 12 | THE INTERPRETER:  (Interpreter nods head in |
| 12:54:21 | 13 | the affirmative.) |
| 12:54:22 | 14 | THE WITNESS:  -- yes, with a dancing |
| 12:54:24 | 15 | handkerchief.  And this is sold for more or less the |
| 12:54:29 | 16 | same price.  And it packs small and it shows great. |
| 12:54:30 | 17 | This is a very important argument, selling tricks, |
| 12:54:35 | 18 | magic tricks.  And this is the same thing with this |
| 12:54:38 | 19 | trick, packs small, shows great.  And I think it's |
| 12:54:42 | 20 | a very nice illusion that could be sold on a similar |
| 12:54:49 | 21 | price like the vanishing silk is sold. |
| 12:54:51 | 22 | Q.  BY MR. TRATOS:  Okay.  Anywhere on -- |
| 12:54:52 | 23 | A.  I'm sorry.  The dancing silk. |
| 12:54:53 | 24 | Q.  Yes.  Anywhere on the Internet did you see |
| 12:54:56 | 25 | a rose that falls apart being sold with instructions |

| | | |
|---|---|---|
| 13:38:56 | 1 | on the Internet, and I did it by myself. |
| 13:39:00 | 2 | Q. Did you go to the copyright office's website |
| 13:39:06 | 3 | to complete the registration? |
| 13:39:08 | 4 | A. Yes, Mr. Tratos. |
| 13:39:10 | 5 | Q. Did you look while you were on the copyright |
| 13:39:13 | 6 | office's website to see if Mr. Teller had a copyright |
| 13:39:17 | 7 | in his -- in his illusion? |
| 13:39:22 | 8 | A. Not at that time, Mr. Tratos. |
| 13:39:26 | 9 | Q. So you went on it to protect your own, but |
| 13:39:29 | 10 | you did not check to see if Teller had registered his |
| 13:39:33 | 11 | own copyright; correct? |
| 13:39:34 | 12 | A. I presumed that there was no copyright on |
| 13:39:38 | 13 | Mr. Teller's trick. |
| 13:39:40 | 14 | Q. Why did you presume that, sir? |
| 13:39:42 | 15 | A. Because I didn't see any copyright symbol |
| 13:39:49 | 16 | or anything what [sic] could -- |
| 13:39:55 | 17 | (Comment in Dutch by the witness.) |
| 13:39:55 | 18 | THE INTERPRETER: "Which would indicate." |
| 13:39:57 | 19 | THE WITNESS: -- which would indicate that |
| 13:39:58 | 20 | Mr. Teller's trick was copyrighted, not on any video |
| 13:40:03 | 21 | from Shadows and not in any newspaper or any news or |
| 13:40:07 | 22 | magic magazine. |
| 13:40:09 | 23 | And on top, I -- I did research the copyright |
| 13:40:13 | 24 | office. And the first text on -- what I found on the |
| 13:40:17 | 25 | web link from -- on -- on the website from the copyright |

| | | |
|---|---|---|
| 14:24:03 | 1 | Mr. Tratos. |
| 14:24:05 | 2 | Q.   Okay.  If you'll flip the page, then, to |
| 14:24:10 | 3 | TELLER000015. |
| 14:24:14 | 4 | A.   Okay. |
| 14:24:14 | 5 | Q.   Calling your attention to the second |
| 14:24:16 | 6 | paragraph, you write: |
| 14:24:19 | 7 | "I believe the main question to be answered |
| 14:24:22 | 8 | is the following.  How much is it worth to you, having |
| 14:24:27 | 9 | the knowledge that, by selling the newer version, the |
| 14:24:31 | 10 | old version loses its value dramatically." |
| 14:24:35 | 11 | You knew that, if you started selling your |
| 14:24:37 | 12 | version, it would hurt his version; correct? |
| 14:24:47 | 13 | A.   Correct.  Yes. |
| 14:24:47 | 14 | Q.   (Reading.) |
| 14:24:50 | 15 | "The 'Teller Shadows' performance is no longer |
| 14:24:54 | 16 | exclusive." |
| 14:24:54 | 17 | You wrote that; correct? |
| 14:24:56 | 18 | A.   Correct. |
| 14:24:56 | 19 | Q.   (Reading.) |
| 14:24:57 | 20 | "You nor Penn" can "say no longer 'that no one |
| 14:25:01 | 21 | knows, or ever will know how it's done.'"  (As read.) |
| 14:25:05 | 22 | You wrote that, didn't you? |
| 14:25:07 | 23 | A.   Yes, sir.  I wrote the entire e-mail, sir. |
| 14:25:10 | 24 | Q.   (Reading.) |
| 14:25:11 | 25 | "Even protracted lawsuits cannot prevent" the |

| | | |
|---|---|---|
| 16:03:41 | 1 | two years. |
| 16:03:42 | 2 | What was the total amount of income that you |
| 16:03:45 | 3 | have received in 2011? |
| 16:03:50 | 4 | A.   Zero euro, zero dollar, Mr. Tratos. |
| 16:03:54 | 5 | Q.   How many euros? |
| 16:03:56 | 6 | A.   Zero euros, zero dollars, nothing. |
| 16:04:01 | 7 | Q.   And how have you been able to live, receiving |
| 16:04:05 | 8 | zero income?  Have you had savings to live on? |
| 16:04:08 | 9 | A.   As I told you in the discovery requests, I'm |
| 16:04:12 | 10 | living from my savings.  Yes. |
| 16:04:14 | 11 | Q.   All right.  How much money did you receive |
| 16:04:17 | 12 | in 2012 from your income -- 2012 income? |
| 16:04:26 | 13 | A.   Zero, Mr. -- Mr. Tratos.  Nix, nada, not one |
| 16:04:33 | 14 | dollar, not one euro, Mr. Tratos. |
| 16:04:36 | 15 | Q.   And have you been living on your savings for |
| 16:04:38 | 16 | the year 2012? |
| 16:04:40 | 17 | A.   Yes, Mr. Tratos. |
| 16:04:41 | 18 | Q.   Is the same thing true for 2013, that you've |
| 16:04:46 | 19 | received no dollars and no euros in 2013? |
| 16:04:49 | 20 | A.   Yes, Mr. Tratos. |
| 16:04:50 | 21 | Q.   Okay.  And you're still living on your |
| 16:04:53 | 22 | savings? |
| 16:04:54 | 23 | A.   I try to survive, Mr. Tratos. |
| 16:04:57 | 24 | Q.   And, in particular, do you receive any kind |
| 16:05:01 | 25 | of governmental aid or assistance, for example, in |

1       CERTIFICATE OF REPORTER

2

3              I, BRENDA MATZOV, CA CSR No. 9243, do hereby

4    certify:

5              That, prior to being examined, the witness

6    named in the foregoing deposition was duly sworn by me

7    to testify the truth, the whole truth, and nothing but

8    the truth;

9              That the foregoing deposition was taken before

10   me at the time and place herein set forth, at which time

11   the aforesaid proceedings were stenographically recorded

12   by me and thereafter transcribed by me;

13             That the foregoing transcript, as typed, is a

14   true record of the said proceedings;

15             And I further certify that I am not interested

16   in the action.

17

18             Dated this 17th day of June, 2013.

19

20   _____

21   BRENDA MATZOV, CA CSR No. 9243

22

23

24

25

# Exhibit 4

Begin forwarded message:


**From:** Teller ██████████████████████
**Subject: Correction**
**Date:** March 28, 2012 8:41:13 PM PDT
**To:** Gerard Bakardy <gerard-bakardy@hotmail.com>

Dear Gerard,

My attorney noticed today that the wide shot 6-minute version of "Shadows" was mistakenly left posted on YouTube.  He informed YouTube of the copyright violation and the video has now been taken down.

I hope to hear from you soon and to resolve this all in an amiable manner.

Cordially,

TELLER


Begin forwarded message:
**From:** gerard bakardy <gerard-bakardy@hotmail.com>
**Subject: RE: At last**
**Date:** March 29, 2012 10:29:30 AM PDT
**To:** Teller Penn & Teller <██████████████████████>

Good morning Mr. Teller,

It was nice talking with you on the phone. I hope things are going well.
I'm sorry to reply with a little delay to your 'offer' email.
I must say that I knew that you're a great magician, but I think you have also other gifts,
the offer you did is really like a joke to me, coming from a comedian.

Especially when you told me in your previous email that you were working on a deal
with a happy ending for the two of us.
The first line in your last email starts already by telling the opposite and shows you're
aware that I never can accept such a ridiculous 'proposal'.

I think it is not wise to argue and to discuss about the 'artists' fee or value from any art
as such.
It's the artist who sets the value of his performance / product / act.
I am really surprised by the low value you assign to the trick that you claim is your

signature trick.

So I think we have to see this matter in a different way:

As you could see, before the film even starts, in the first picture, the trick and obviously the method I created is completely different from yours.
As you said in our first phone conversation "that you were searching and never found a way to obtain what I managed to do: using a crystal clear vase/bottle and a removable stem.
You also mentioned that pouring water out of the vase/bottle could be an anti climax in the trick. As a matter of fact, you were numerating all the differences.

Also in your emails I could read that you see it as a "potential step towards improving … "

In 'the old' version most magicians and some spectators would think that the prop or 'help' is situated in the white vase used in your trick especially because the vase, neither the stem is moved or showed after cutting the petals, neither water is poured out of the vase.

I do honestly believe that I created a brand new effect, because I have highlighted the impossibility to manipulate a rose in her shadow.
There are more magicians and artists, as you can find on the Internet,  who are moving objects (flowers, chairs, bottles, persons…) using manipulation in a shadow.

Mr. Teller, let me tell you, I'm just a poor hard working man, I have no big contracts, no big properties, no big anything, the only big thing I have are… debts!
And last year I've had big luck, I over won a terrible C… disease and now I feel rich because I have my health back.  Since then I see life in a different way.

Now I see the opportunity to change my big negatives for better.
I see a lot of profits in sales, I have the feeling that a lot of magicians and even 'just magic lovers' are excited to buy my 'improved' version.

Let's be honest,… as long as the 'Chinese' magic manufacturers  (the yellow danger) are not interfering.

You know just as I do, that over years, selling this trick can make millions.
Already now I've put 14 orders on hold. Without any add.
I'm sure you'll understand that I can't walk away from this, and that your proposal is too far off from what could be a 'happy ending' for me.


A few thoughts that crossed my mind in searching a happy solution for both of us:

a)    I ask you to inform me about what's exactly copyrighted, so I can adjust my version and go around your copyrights so I can copyright my own new method.

b)    We could work out cooperation and share the profits from the sales.

c)     I could sell the whole thing to a clever Chinese, which I prefer not to.

d)    You could offer me a decent deal and make me forget the sales profit I'm going to miss out,

e)    then you can use the improved method and refresh the 37 years old version and be sure there is no other magician or  amateur doing the improved version

    to entertain the school kids behind the corner.

f)    Whenever you decide to release it as a product you're still taking full profit.

I believe the main question to be answered is the following:

How much is it worth to you, having the knowledge that:

By selling the newer version, the old version loses its value dramatically.

The 'Teller Shadows' performance is no longer exclusive.

You nor Penn can't say no longer  "that no one knows, or ever will know how it's done"

Even protracted lawsuits cannot prevent that 'damage' is done.

Legal headaches and aggravation don't lead to a 'happy ending'.

When it comes to finances, I believe we're in the same position. We both like to make money.

You can afford expensive lawyers and lawsuits without missing out on one meal.

I  cannot afford all of this, but I have nothing to lose and I'm happy with a simple hot dog.

Also you seem like a very good man, talented, charming, and very clever.

Allow me to guide you  in the right direction which in my opinion can lead to a more respectable and fair proposal.

Over the years I expect to make a minimum profit of four or five million.

I'm willing to walk away from 95% of the expected sales profits, I'm not greedy,

I am satisfied with the remaining 5% which will cost less than the expensive court cases that we both wish to avoid.

Mister Teller, just put yourself in my shoes and make me a proposal you could accept. In that way we can, as you said in your last line, turn bad to good and move on with clear hearts and warm feelings.

Respectfully,
Gerard.

Ps. Sorry for my expression in the English language, I have no intention to be harsh, it's not so easy for me to find the right words to express my thoughts and emotions, as we said on the phone.

TELLER000015

# Exhibit 5

http://www.youtube.com/watch?v=BYmt7NtO85Y

✱ Live now: Cults performing at the SXSW festival in Austin.

  [ Search ] Q   Browse  Movie

## The Rose & her Shadow in Close up ! - Gerard Bakardy

Gerarreke  ⊕ Subscribe  6 videos ▾



▶  ◀))  0:53 / 1:51  ⚙ ▢ ▢ ⛶

👍 Like  👎  + Add to ▾  Share  🚩                    14 views  📊

Uploaded by Gerarreke on Mar 15, 2012                    0 likes, 0 dislikes

The magician cuts one by one the leaves from a rose... in her shadow ! But it
happens in reality on the real rose which is standing 2 meters away from her
shadow. Everything is separate and loose from each other, so how is this
possible? This is the most Magical, romantic and beautiful illusion I know.
I've seen the great Penn & Teller performing a similar trick and now I'm very
happy to share my version in a different and more impossible way with you. It
is so magical to manipulate a shadow! The audience is so surprised
especially when they see that the stem and 'vase' filled with water are
removed from the table ! In combination with the floating table effect, these
are fur sure 'the' eye catchers' in my show.
It could be a wonderful and refreshing addition to all your coin or card tricks
on show !
Thanks for watching my movie,

**Category:**
Entertainment
**Tags:**
The  rose  her  shadow  Magic  trick  illusion  Floating  table  Gerard
Bakardy  Penn  Teller  Magic (illusion)  Card  Tricks  Revealed  Coin  Cards
Magic Trick  Criss  David  Blaine  Magician  Cool  Amazing  Tutorial
Magic Tricks
**License:**
Standard YouTube License

TELLER000069

Show less

All Comments (0)                                    see all



TELLER000071

# EXHIBIT 6

Gerard Dogge
Hoevensebaan 2 – 2950 Kapellen
Belgium – Europe
Gerard-Bakardy@hotmail.com
Cell: 011.34.606.35.65.04.

28th, of March 2013

**No Counsel  - PRO - SE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

**CASE N° 2:12-cv-00591-JCM-GWF**

Teller, an individual

     Plaintiff.

v.

Gerard Dogge (Gerard Bakardy),
an individual

     Defendant.

**Answer to plaintiff's**
second set of requests for admissions
&
**Defendant second set of**
**requests** for admissions to plaintiff

Honourable Judge George Foley Jr.,

Forgive me for approaching the Court in this way, for defending myself in a poor English vocabulary. As mentioned before, I'm not a lawyer, and especially not an American lawyer.

I'm also not an American citizen, I'm European, with a Dutch nationality, born and residing in Belgium and therefore obliged to 'know' the Belgian law. Logical. In the same way as, I believe, the American citizens are expected to know the USA Federal Law.

So, forgive me, I don't know the American law.  Although plaintiff was so kind to send me a 150 pages with the *Federal Rules of civil procedure* and another 150 pages with the *Local Rules of practice*, it is not realistic to expect that these documents make me a American citizen or lawyer. To translate and understand these 300 pages, written in English, into my language (Flemish-Dutch) would take a long time. To practice the USA law would take another number of years.

**Request N°29:** Admit that you and Teller discussed your use of a flower other than a rose as part of one option to avoid copyright infringement.

**Response:** Objection. This request is vague and ambiguous with respect to the phrase 'one option to avoid'. Notwithstanding the objections, the defendant admits that he discussed with Teller several options to satisfy both parties.

That's why defendant asked Teller to send 'his' copyright detail's.  In this way Bakardy would be informed about 'what' was copyrighted. Teller refused.

**Request N°30:** Admit that when you uploaded the video of 'The Rose and her Shadow' to YouTube, you 'tagged' the video with a number of 'tags', to include "Penn".

**Response:** Defendant admits.

**Request N°31:** Admit that when you uploaded the video of 'The Rose and her Shadow' to YouTube, you 'tagged' the video with a number of 'tags', to include "Teller".

**Response:** Defendant admits.

**Request N°32:** Admit that when you uploaded the video of 'The Rose and her Shadow' to YouTube, you 'tagged' the video with a number of 'tags', to include "Tutorial".

**Response:** "Tutorial" was automatically 'suggested' by YouTube. Probably because 'tutorial' is a common tag on videos of 'Penn & Teller'.

**Request N°33:** Admit that when you uploaded the video of 'The Rose and her Shadow' to YouTube, you 'tagged' the video with a number of 'tags', to include "revealed".

**Response:** "Revealed" was automatically 'suggested' by YouTube. Probably because 'revealed' is a common tag on videos of 'Penn & Teller'.

**Request N°34:** Admit that you refer to Penn & Teller in the description of your YouTube videos.

6

**Request N°37:** Admit that in a phone conversation, you've asked Bakardy if he possibly could customize his 'rose' to your wishes, like to have the first two under 'leaves' not that close by the stem as they are in Bakardy's version, but further away from the stem like they are in Tellers 'shadows' version. And to customize the 'speed' in the action of the movement, to make the falling of the petals or leaves more smooth or fluently.

**Request N°38:** Admit that in Tellers answer to the defendants interrogatory n°22 and n°23 to identify your own exhibits 3, Teller states: "This interrogatory is not relevant.."

**Request N°39:** Admit that Tellers answer to defendants interrogatory n°22 states: "exhibit 3 is a screenshot..captured on or about March 30,2012" is vague and not clear about the date and time the screenshot was taken.

I am looking forward to the oral pleadings to discuss or further justify the defendants requests and answers. I am now awaiting the plaintiff's answers.

Dated : March 28th, 2013.

With the deepest respect for the Court,

Gerard Dogge

Hoevensebaan 2, B2950 Kapellen
Belgium - Europe

14



# Wereld Primeur-Eerst in Belgie

## The Rose & Her Shadow !

### Her Shadow !



Made in Belgium !!!
Klein verpakt – Groots effect
Volledig zelfwerkend !
Geen 'sleight of hand' !

### Beter dan in Las Vegas

Op het podium staat een tafeltje met daarop een met water gevuld flesje met daarin een roos ! Ongeveer 1.5 meter daarachter staat een wit bord of witte muur waarop de schaduw te zien is van deze roos, afkomstig van een bundelspotlicht die enkele meters voor de tafel staat. Dan komt de goochelaar, bekijkt rustig de hele situatie, benadrukt de schaduw door enkele bewegingen te maken, neemt een mes of schaar en begint stuk voor stuk de blaadjes van de bloem te snijden.... Maar niet van de echte bloem !! Hij doet dit in de schaduw bloem !!! Maar toch vallen de blaadjes van de echte bloem en uiteraard ook in de schaduw is dit te zien. Om de toeschouwer duidelijk te maken dat er geen 'onzichtbare' draadjes zitten tussen de echte roos en de schaduw roos loopt de goochelaar enkele malen tussen deze twee in alvorens hij een totaal 'kale' rozenstam verkrijgt.

De toeschouwers die denken een verklaring te kennen worden eens te meer ontgoocheld of moet ik zeggen 'begoocheld' als de goochelaar de stam uit het heldere flesje neemt, vervolgens het flesje van de tafel neemt en... leeg giet want er zat nog water in ook !!!

Iedereen zal met verbazing vragen:
"Hoe is het mogelijk ?"



2 vliegen in één klap !!
"The Rose & Her Shadow"
+
"Zwevend Tafeltje Illusie"
Mits een kleine voorbereiding kan je twee illusies vertonen met één investering !

Kies zelf je uitvoering :
Dubbele illusie – De Roos met Zwevende Tafel : 2.450€
Enkel de Roos met gewone tafel : 2.299€
Komt in één koffertje met volledige handleiding & DVD

*Een onverslijtbare truc !!*
*Deze heb je voor het leven en*
*zal de parel zijn in je optreden!*
TELLER000031

## Meer Info ?    Bestellen:

Tel.: 0034.606.35.65.04.
Email: gerard-bakardy@hotmail.com
Youtube : Gerard Bakardy -The Rose & Her Shadow

**World Premiere – First in Belgium**

<u>Boxed text on the right side of the page</u>

On stage is a table with a bottle filled with water and containing a rose! Approximately 1.5 meters behind it is a white board or white wall showing the shadow of this rose, in the beam of a spotlight a few meters in front of the table. Then the magician comes, calmly surveys the whole situation, highlights the shadow with some motions, take a knife or scissors and begins to cut each petal of the flower, piece by piece. But not the real flower! He is doing it with the shadow flower!! Yet the leaves fall from the real flower and of course this is seen in the shadow. To remove any doubts of the audience, that there might be "invisible" wires between the real rose and shadow rose, the magician moves several times between the two before he produces a completely "bare"' rose stem.

The spectators who think they know the trick are disappointed, or should I say 'deluded', as the magician takes the stem from the clear bottle, then takes the bottle from the table and ... empties it, because there is still water in too! !

Everyone will ask in amazement: "How is that possible?"

<u>Middle of the page, opposite text box:</u>

Made in Belgium!!
Small package - Big impact
Completely automatic!
No 'sleight of hand'!
Better than in
Las Vegas

<u>In the white star under the text box:</u>

Two birds with one stone!
"The Rose & Her Shadow"
          +
"Floating Table Illusion"
With a little preparation
You can present two illusions
with one investment!

<u>Bottom of page above the white rectangle, left:</u>

Choose your own presentation:
Double illusion - The Rose with Floating Table: € 2,450

**TELLER000421**

Rose only, with ordinary table: € 2,299
Comes in a case with full manual & DVD


Bottom of page, above the white rectangle, right:

An unbeatable trick!!
You have it for life
And it should be the pearl of your performance!
Teller000031

White box at bottom of page:

Left:

More information?

Middle:

Order:

Right side:

Tel:. 0034.606.35.65.04.
Email: gerard-bakardy@hotmail.com
Youtube: Gerard Bakardy-The Rose & Her Shadow

TELLER000422



**ASTA-USA TRANSLATION SERVICES, INC.**
314 WEST 18TH STREET  CHEYENNE, WYOMING  82001
TEL.: 866.446.1860 │ FAX.: 866.297.0606 │ WWW.ASTA-USA.COM │ WWW.LEGALTRANSLATIONSOLUTIONS.COM

## CERTIFIED TRANSLATION

*Documents Translated For:*

| LAST NAME: Ney | FIRST NAME: Cynthia | MIDDLE NAME: N/A |
|---|---|---|
| COMPANY: Greenberg Traurig, LLP | DIVISION: N/A | |

*List of Materials, Documents, Forms, Transcripts, Licenses, etc., translated.*

| |
|---|
| Ad entitled World Premiere – First in Belgium [1 page] |
| Teller v. Dogge; United States District Court, District of Nevada, Case No. 12-00591 |
| |

| Source Language: | Dutch |
|---|---|
| Target Languages: | English |

### SAN DIEGO, CALIFORNIA

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translation completed by ASTA-USA's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated has caused the Certificate to be signed by its duly authorized officer(s).

**By:** _____     **Date:**   June 10, 2013

          Alain J Roy, President                      _____

A copy of the translated version is attached to this statement of certification.



The National Association of Judiciary Interpreters & Translators - Member #7031

The American Translators Association – *Member #243198*

**ASTA-USA Translation Services, Incorporated** - *A Member in Good Standing*



F-C1206

# Exhibit 8

1 | Mark G. Tratos (Bar No. 1086)
tratosm@gtlaw.com
2 | Nancy R. Ayala (Bar No. 7146)
ayalan@gtlaw.com
3 | Peter H. Ajemian (Bar No. 9491)
ajemianp@gtlaw.com
4 | GREENBERG TRAURIG, LLP
5 | 3773 Howard Hughes Parkway
Suite 400 North
6 | Las Vegas, Nevada 89169
Telephone: (702) 792-3773
7 | Facsimile: (702) 792-9002
8 | *Counsel for Plaintiff*

9 | **UNITED STATES DISTRICT COURT**

10 | **DISTRICT OF NEVADA**

11 | Teller, an individual,

12 | Plaintiff,          Case No. 2:12-cv-00591-JCM-GWF

13 | v.

14 | Gerard Dogge (p/k/a Gerard Bakardy), an individual.          **DECLARATION OF JIM STEINMEYER**

15 | Defendant.

16

17

18 | I, Jim Steinmeyer, declare as follows:

19 | 1.          Since 1981, I have been a magic consultant, designer and concept designer in the field

20 | of entertainment.  I have been a designer of magic effects for professional magicians, a consultant

21 | and designer for shows, including Las Vegas shows and Broadway shows.

22 | 2.          I make this declaration based upon my personal knowledge and pursuant to Local

23 | Rule 26-7.

24 | 3.          I am the expert retained by Teller to examine the evidence in this case and who

25 | tendered the expert report in the litigation and based upon my review of the evidence I have the

26 | following observations that may help the Court in assessing damages and the scope of the injunction.

27

28

*GREENBERG TRAURIG, LLP*
*3773 Howard Hughes Parkway, Suite 400 North*
*Las Vegas, Nevada 89169*
*Telephone: (702) 792-3773*
*Facsimile: (702) 792-9002*

4.      I have observed other circumstances in the entertainment industry that are similar to the instance in which Teller has found himself, where an infringer, fascinated with a particular trick or magician, becomes obsessive about the particular owner of the illusion and continues to attempt to take advantage of the illusion's owner over a protracted period of time.   I've observed this happening with magician David Copperfield, and I have personally experienced that same circumstance involving my own inventions.

5.      Based upon Mr. Dogge's conduct and the unusual pleadings that he has filed, I believe that, like other misguided individuals he may well continue to try to trade on the notoriety of this case and his brief brush with celebrity by being sued by Teller if he is not enjoined from continuing to use Teller's name, celebrity, persona and the other illusions which Teller is clearly associated with.

6.      In my opinion, if Dogge sold his flower prop to other magicians, they would use it to perform Teller's famous illusion Shadows rather than try to adapt it to produce a new magical effect, thereby damaging the value of Teller's original.

7.      While I opined in my formal opinion on the Shadows illusion, which is Teller's most famous, his other original illusions like Silverfish, are also strongly associated with Teller by both the magic community and the public at large.   Illusions like Silverfish, The Needles illusion, the Ball and the Double Bullet Catch similarly involve high degrees of originality and many elements particular to Teller, and are performed in the Penn and Teller Show regularly.

8.      I know from both my research and my personal communication with Penn and Teller that they strive to make all of their illusions original, and consider that a great deal of the value of their performances lies in the originality of their illusions.   To the extent that Mr. Dogge would attempt to duplicate or assist others in duplicating any of the other illusions strongly associated with their act, Teller, and the show of Pen and Teller would be damaged by such ongoing conduct.

///

///

///

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002

1    I declare under penalty of perjury under the law of the United States of America that the

2 foregoing is true and correct.

3    DATED this ____ day of July, 2014.

4

5                                            _____

6                                            Jim Steinmeyer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone (702) 792-3773
Facsimile (702) 792-9002